470 A.2d 553

**Florence A. Todd KNAUER, a/k/a Florence A. Todd, Appellee**

v.

**Lewis E. KNAUER, Jr., Appellant.**

Superior Court of Pennsylvania.

Argued May 2, 1983.

Filed Dec. 16, 1983.

Petition for Allowance of Appeal Denied April 6, 1984.

208

Edward J. Carney, Jr., Media, for appellant.

Rodger L. Mutzel, Media, for appellee.

Before CERCONE, President Judge, and McEWEN and HOFFMAN, JJ.

CERCONE, President Judge:

Defendant-appellant, Lewis E. Knauer, Jr., takes this appeal from the jury verdict and accompanying order and judgment of the court, awarding plaintiff-appellee, Florence A. Todd a/k/a Florence A. Todd Knauer, the sum of $30,-000.00 in her action in assumpsit. Appellant raises numerous issues in his appeal. Finding these issues to have no merit, we affirm.

Appellee and appellant first met in 1969 when appellant, a building contractor, was hired to build a home for appellee and her first husband, Robert Todd. At that time, appellee was living with her husband and two teenaged children in Swarthmore, Delaware County, Pennsylvania, while appellant and his first wife, Pearl, and their four children lived in Upper Chichester, also in Delaware County, Pennsylvania. Gradually, the parties fell in love and in the summer of 1971 both parties separated from their respective spouses. A year passed, and in the summer of 1972 appellant began work on the construction of an apartment building in Dover, Delaware. Then, in August of 1972, appellant, tired of commuting from Pennsylvania to Delaware, decided to take up residence in Delaware. According to the testimony of appellee, it was at this time that appellant said to appellee:

[Y]ou come with me. I will take care of you the rest of your life. We will share everything together. And at the end of one year, if we are still compatible, we would plan to marry.

Appellant denies ever making such a statement. Appellant contends that appellee announced that she was moving in to live with appellant in Delaware which she did on October 15, 1972. Once in Delaware, appellee began working as a waitress. At trial appellant testified the parties didn't discuss expenses before they moved, and he further stated:

I assumed when Florence [appellee] went down there, she would at least be able to carry her own. I assumed that I wasn't taking on a liability or a dependent. I assumed we were going down there and just coexist.

In any event, appellee did not make very much money as a waitress, so the parties then decided she should quit her job, which she did, and she then went to work for appellant's corporation, known as Lekco, Inc., a Pennsylvania corporation. Appellee was employed in a supervisory capacity with Lekco and her duties were to oversee the various subcontractors at a new construction project begun by appellant on Governor's Avenue in Dover, Delaware. According to appellee's testimony, before appellant began

the new project, he brought appellee to see the property and told her that he would like to build two duplexes on the two lots. He asked appellee to quit her waitress job and oversee the construction of the duplexes. In exchange, appellant promised to pay appellee a salary of $200.00 per week, gross pay, ($150.00 net pay) plus he would give her a share of the profits from the sale of the units. Appellee agreed. According to appellee, in addition to going to the construction site and overseeing the work of the subcontractors, appellee also assumed the office of secretary of the corporation and was responsible for keeping the books and records. However, while appellant admitted at trial that appellee worked for Lekco, Inc., he denied either that he promised appellee a share in the profits or that appellee became an officer in the corporation. All this time appellant and appellee lived together. Thereafter, each of the four units was sold at a price of $21,900.00. Another tract of land was purchased and the corporation began construction of five more duplexes (10 more units). During this time, appellee's work for Lekco continued. Also, while the parties were living together, appellee did all of the shopping, cooking, cleaning, and household duties.

Then, in spring of 1974, appellant announced that he was going back to his wife, Pearl. However, before he left, he wrote the following will:

To Whom It May Concern: In the event of accidental and/or natural death of Lewis E. Knauer, Jr., president of Lekco, Inc., a Pennsylvania corporation, the then existing assets and liabilities and land, improvements, equipment and stock of the company, Lekco, Incorporation, shall be immediately transferred to Miss Florence A. Todd, a single woman, who shall then be the sole owner of Lekco, Incorporated, and who shall continue or terminate its existence as she may decide is in her best interest.

This has been written with a free mind and without reservation and shall remain in effect until such time as I personally revise or terminate its existence. Such revi-

sions or terminations shall be recorded in the company minutes.

After an absence of three weeks, appellant returned to appellee. Appellee testified that when appellant returned he made these declarations:

> When he [appellant] came back he told me that he did what he thought he had to do. But there was no way that he could go back to Pennsylvania, that he loved me very much. And he had to come back to me. And this is where he wanted to be, to share life with me and to share everything we had together. And now it was time for us to get a home.

Whereupon, the parties began living together and went looking for a lot upon which to build a house.

But despite their apparently amicable personal relationship, the parties thereafter had disagreements at work, and in August of 1974 appellee was laid-off from Lekco, Inc., although she continued to be called upon on occasions to work on the books. Notwithstanding this turn of events, the parties continued their search for a house and in the winter of 1974 they purchased a site in Cecil County, Maryland. Both appellant and appellee signed the agreement of sale, however, afterwards appellant asked appellee to sign a separate agreement transferring her interests in the property to appellant. When appellee asked for an explanation, appellant said "because of tax reasons and business purposes." Appellee agreed, and both parties signed the following document:

> THIS AGREEMENT made this 27th day of December, 1974, by and between LEWIS E. KNAUER, JR., Party of the First Part, and FLORENCE A. TODD, Party of the Second Part.
>
> IN CONSIDERATION of the party of the second part assigning her interest in the Lot which the parties agreed to purchase from Harlan S. Young to the party of the first part. The parties agree that should either party die before the property is titled in joint names, that the

survivor's interest shall be the net equity in the property as of the date of death.

It is the intent of the parties hereto that the party of the first part upon the preparation of a partnership agreement or similar arrangement will transfer this property unto both parties names hereto. This property will be subject to a Note and Mortgage with the Bank of Delaware and eventually to a regular mortgage with a standard amortization.

Appellee testified that she invested no money into this property and did not sign a mortgage nor made any mortgage payments. Eventually, a house was constructed on the property, at a cost of $146,058.00. When it was sold, the house only brought $130,000.00.

Then in August of 1978, appellant decided to buy two undeveloped lots on Amosland Avenue in Prospect Park, Pennsylvania. Appellee lent appellant $9,200.00 towards the purchase price. When appellant said that he would repay appellee, appellee replied, "I don't need your money to pay me back with interest. This is my part of sharing with you." Appellant answered, "Okay, fine. We will share this as we have done other things."

On March 2, 1979, appellant terminated the relationship with appellee and left the parties' home in Maryland. Appellant then married another woman, and brought his new wife with him when he returned to the Maryland house in April of 1979. Appellee was still in the house at the time, but she vacated the premises in May of 1979.

## I.

The first issue which appellant raises is a choice of law question. Appellant asserts that the lower court erred when it applied the law of Pennsylvania, rather than the law of Maryland, to the instant case. The rule to be applied to choice-of-law issues is set forth by our Supreme Court in *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964). In an exhaustive discussion on the subject, the

*Griffith* Court rejected a former rigid rule [1] in favor of the greater flexibility in the choice of law rule as advocated by the American Law Institute's Restatement of Conflict of Law, Second. Although the *Griffith* case discussed conflicts of law specifically in the context of torts, in a subsequent case before our Court *Gillan v. Gillan*, 236 Pa.Superior Ct. 147, 345 A.2d 742 (1975), we applied *Griffith* to a case in assumpsit.[2]

In *Gillan*, we quoted from section 188(1) of the Restatement of Conflict of Laws, Second, which reads:

> The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

Section 6, referred to in this passage, provides generally:

*Choice-of-Law Principles*

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

---

**1.** In tort cases prior to *Griffith,* the former rule was that the law of the place of the wrong governed. *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964). As for assumpsit actions the rule prior to the *Gillian* decision was that in matters relating to the enforcement of a contract or in matters concerning the remedy for breach of a contract, the *lex fori,* or law of the place where such remedies are pursued, applied. *Silvestri v. Slatowski,* 423 Pa. 498, 224 A.2d 212 (1966) (plurality).

**2.** See also *In Re Estate of Agostini,* 311 Pa.Superior Ct. 233, 251, 457 A.2d 861, 871 (1983), wherein the Court stated "We observe that Pennsylvania has not restricted the application of this flexible choice of law solely to conflict questions involving torts." (citations omitted).

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Section 188(2) of the same Restatement sets forth the contacts considered significant in resolving a choice of law issue in a case in assumpsit. This section reads:

In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principals of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

■ Applying the Restatement test to the instant case, we find no error in the lower court's ruling that Pennsylvania law applies. Appellant first promised appellee that they would "share everything" in 1972 while the parties still were residing in Pennsylvania. Additionally, appellee worked for two years for appellant's corporation, Lekco, Inc., a Pennsylvania corporation, and an important part of the case at bar pertains to appellee's claim for a share in the profits of Lekco, Inc. Furthermore, appellee is also suing to recover the outstanding balance on a $9,200.00 loan which she made to appellant towards the purchase of a tract of land in Prospect Park, Pennsylvania. These facts,

weigh in favor of application of Pennsylvania law despite the fact that the parties lived for a time in the State of Maryland. Consequently, we find that Pennsylvania has the most significant relationships to the transaction which occurred between appellant and appellee, and we affirm the lower court's ruling on this point.

## II.

### A.

Appellant next argues that the contract sued upon is based upon a meretricious relationship and thus is a void contract and against the public policy of Pennsylvania. Appellant asserts that the only consideration for appellant's promise to "share everything" was a promise of sexual services by appellee. We disagree with this careless description of the parties' relationship.

■ While it is generally held that a contract founded solely on the procurement of sexual services is unenforceable as contrary to public policy, nevertheless, it is also the rule that mere cohabitation between negotiating parties does not render them incompetent to form binding contracts regarding other transactions. *Baldassari v. Baldassari*, 278 Pa. Superior Ct. 312, 420 A.2d 556 (1980). The case of *Baldassari v. Baldassari, supra,* dealt with a comparable agreement. Suit in *Baldassari* was initiated in trespass for fraud and deceit and in assumpsit for breach of a written agreement. The parties lived together for approximately fourteen years, from 1960 to 1974. Throughout the parties' entire relationship, the defendant was married to another woman, a fact known by plaintiff from the beginning. Four children were born of the relationship, and plaintiff assumed the roles traditionally assumed by wife and mother, staying at home to rear the children and maintain the home, and also entertaining defendant's business associates. But despite their prolonged cohabitation, the parties' relationship was punctuated by frequent disputes and periods of separation. It was during one of these periods of separa-

tion that the parties entered into a written agreement, wherein for a recited consideration of $1.00 and a pledge by plaintiff to provide a home environment for the four children, defendant agreed to lease to plaintiff for a period of forty years a home that was in the process of being constructed on land allegedly owned by defendant. It was further agreed that should defendant sell the home during the term of the lease, forty percent of the proceeds would be distributed to plaintiff and sixty percent to the children. Defendant also agreed to write a will devising the home to plaintiff and the children in the same proportions. The agreement was signed and plaintiff moved back into the parties' apartment and took care of the children. However, relations between the parties did not improve and approximately four months later plaintiff again vacated the apartment. Only then did plaintiff discover that defendant did not own the lot upon which the home was being constructed. Whereupon plaintiff sued and, following a jury trial, a verdict was returned for breach of contract,[3] and defendant appealed. In our opinion affirming the enforcement of the contract, we "decline[d] [defendant's] offer to espouse the moral, ethical and legal considerations arising from the type of relationship to which the parties voluntarily committed themselves." 278 Pa.Superior Ct. at 318, 420 A.2d 556. We concluded that such analysis was unnecessary, saying:

> The evidence presented in the instant case establishes that the relationship between [plaintiff and defendant] did not form the basis for the agreement on November 1, 1973. That agreement made no mention of a continuing relationship between [plaintiff and defendant], nor even of an obligation for the parties to resume cohabitation.

. . . . .

3. Plaintiff also filed suit in trespass alleging fraud and deceit. The jury, pursuant to special interrogatories, indicated that its award was based on both trespass and assumpsit theories. The trial judge, however, later granted defendant's motion for judgment n.o.v. on the fraud counts, reasoning that the measure of damages in a fraud action is the "actual loss" and not the "loss of the value of the bargain." The court found that plaintiff did not prove actual loss. Plaintiff took no appeal from the court's ruling.

Thus, we find the evidence sufficient to support the conclusion that the purpose of the agreement was to provide a home and family environment for the children and that the agreement was not based upon consideration that was immoral, illicit, meretricious or otherwise contrary to public policy.

*Id.*, 278 Pa.Superior Ct. at 318–319, 420 A.2d 556.

In *Mullen v. Suchko*, 279 Pa.Superior Ct. 499, 421 A.2d 310 (1980), the plaintiff brought suit in assumpsit and trespass, alleging that defendant had breached an agreement to "take care of her for the rest of her life" if plaintiff would quit her job of thirty-three years and travel with defendant. Plaintiff alleged that she relied on defendant's promise and quit her job. Defendant, although he was a married man, then moved in with plaintiff and began paying many of plaintiff's expenses as well as giving her $500.00 per month. Three months later, defendant left plaintiff's home permanently and stopped assisting her financially. Whereupon, plaintiff filed suit in assumpsit, claiming damages in the form of lost wages, lost employee benefits and indebtedness to her family for support; plaintiff also sued in trespass, alleging damages for severe emotional distress. The trial court dismissed plaintiff's assumpsit count on the grounds that it was contrary to the public policy against contracts in consideration of sexual intercourse and against contracts facilitating divorce. As regarding the trespass count, the court ruled that defendant's actions could not be deemed "outrageous." Plaintiff appealed.

On appeal, we reversed the lower court's disposition of the assumpsit court, rejecting both of the reasons advanced by the trial court for not permitting the case to go to trial. Basically, we held that, considering the averments in the complaint, the sparseness of the record, and the presumption in favor of overruling demurrers, the trial court had an insufficient basis upon which to conclude either that the alleged agreement was entered into by defendant in exchange for meretricious sexual services and nothing else, or that the agreement was entered into for the purpose of

collusively obtaining a divorce where no ground existed. However, on the trespass count, we were in agreement with the trial court's ruling that no cause of action was stated. We noted that while defendant's actions were inconsiderate and unkind, they were not of the extreme and outrageous sort.

Additionally, there are a number of cases in equity which hold that where a man and a woman, not married to each other but cohabiting, take an interest in land proported in the deed to be held by them "by the entireties," the parties' will not be found to hold by the entireties since only a married couple can take such title. Instead, depending on the facts of the case, the parties will be found to hold either as joint tenants with a right of survivorship or as tenants in common. *Masgai v. Masgai*, 460 Pa. 453, 333 A.2d 861 (1975); *Bove v. Bove*, 394 Pa. 627, 149 A.2d 67 (1959); *Teacher v. Kijurina*, 365 Pa. 480, 76 A.2d 197 (1950); *Maxwell v. Saylor*, 359 Pa. 94, 58 A.2d 355 (1948). In other cases, where one party in such a relationship pays the purchase price for the property, but title is held by the other party, a purchase money resulting trust may be raised. *Hughes v. Bailey*, 202 Pa.Superior Ct. 263, 195 A.2d 281 (1963). Alternatively, in some cases, although the purchase money was paid by one party and title is held by the other, the court may decline to impress a resulting trust where the evidence indicates that a gift was intended *Wosche v. Kraning*, 353 Pa. 481, 46 A.2d 220 (1946).[4]

---

4. The case of *Snaith v. Snaith*, 282 Pa.Superior Ct. 450, 422 A.2d 1379 (1980), provides an interesting twist. There, a woman filed suit against her lawful, but estranged, husband alleging breach of an express contract, of a contract implied-in-fact, and of a contract implied-in-law, also partnership, joint venture and unjust enrichment. The trial court read the complaint as basically alleging an express and an implied contract. On appeal, we dismissed the action on the express contract for failure to specify the breach. As for the implied contract, we dismissed based on the established rule that the law will not imply a promise to pay for services rendered where a close family relationship exists between the parties. The plaintiff apparently filed her suit in equity before the effective date of the divorce code of 1980, Act of April 2, 1980, P.L. 26, § 401, which significantly changed the law for property settlements following a divorce.

Other jurisdictions have ruled on similar cases and we now shall examine those decisions.

## B.

The most celebrated case in this area of the law is, of course, *Marvin v. Marvin*, 18 Cal.3d 660, 134 Cal.Rptr. 815, 557 P.2d 106 (1976). The *Marvin* case was, however, antedated by comparable decisions in Oregon, Michigan and Massachusetts.

The *Oregon* decision, *Latham v. Latham*, 274 Or. 421, 547 P.2d 144 (1976), was a suit on an express, oral contract. The plaintiff alleged that the parties were not married but had been living together as husband and wife for nineteen years. Plaintiff further alleged that she "rendered services to the defendant, at defendant's special instance and request, by living with defendant, caring for and keeping after him, and furnishing and providing him all the amenities of married life." In consideration, defendant was said to have agreed to pay plaintiff one-half of all the property, both real and personal, accumulated by the parties during the cohabitation. In ruling in favor of plaintiff, the *Latham* Court held that the contract at issue was not void as against public policy. To reach this conclusion, the Court considered the fact that the legislature had removed all criminal sanctions from private, consensual, sexual activity between competent adults. The Court noted that while it was not condoning the parties "conduct", the Court nevertheless felt that to permit the defendant to keep all of the assets accumulated during the parties' nineteen years together would be unduly harsh. Citing *Tyranski v. Piggins*, 44 Mich.App. 570, 205 N.W.2d 595 (1973), the Court then concluded:

> For these reasons we hold that such an agreement is not void. We are not validating an agreement in which the only or primary consideration is sexual intercourse. The agreement here contemplated all the burdens and amenities of married life.

The referenced case of *Tyranski v. Piggins, supra,* was a case commenced by the plaintiff against the administrator of the estate of Alfred P. Lattavo, a man with whom plaintiff had lived for six years. Despite the fact that both plaintiff and Lattavo, were already married to other people throughout the time they lived together, the Court nonetheless allowed plaintiff to recover on an express, oral agreement between plaintiff and Lattavo. The court wrote:

> Neither party to a meretricious relationship acquires, by reason of cohabitation alone, rights in the property accumulations of the other during the period of the relationship. But where there is an express agreement to accumulate or transfer property following a relationship of some permanence and an additional consideration in the form of either money or of services, the courts tend to find an independent consideration. *Id* at 573, 205 N.W.2d 595.

In this case, the Court found that the consideration given by plaintiff was that she "cleaned the house, did the marketing, cooked the food, did Mr. Lattavo's personal laundry, and acted as his hostess. She cared for him when he was sick, especially during the last year and a half of his life when his condition required greater attention and care." *Id* at 574, 205 N.W.2d 595.

Both *Latham* and *Tyranski* were suits based on an express, oral contract. The case in *Green v. Richmond,* 369 Mass. 47, 337 N.E.2d 691 (1975) is an example of a pre-*Marvin* decision allowing recovery under the equitable remedy of quantum meruit. In *Green,* the plaintiff, a woman, sued the estate of Maxwell Evans Richmond in quantum meruit seeking recovery for services rendered by her in reliance on Richmond's oral promise to leave a will bequeathing his entire estate to her. Plaintiff and Richmond at one time were engaged, the engagement lasting approximately one year, but Richmond asked to be released from the engagement, saying that he had a "mental hangup" about marriage. Richmond, however, did not want to termi-

nate the relationship completely and, according to plaintiff's testimony Richmond said to her:

> He said he couldn't lose me, either, and then he said, 'I have been thinking about something, and I want you to listen to me.' He said: 'I have been looking for you all my life. You're the perfect woman for me.' He said: 'If you will agree to stay with me without marriage, you will be happy. I will see that your life will be happy. There's only one thing you won't have. You won't have the emotional security a woman has when she knows she is married, but I will make it up to you. I am going to make my will out right away. Everything I have when I die will be yours. I owe nothing to anyone else.

The terms of this agreement were corroborated by evidence of statements made by Richmond to other individuals acknowledging the agreement. Pursuant to the agreement, plaintiff performed services of a social, domestic, and business nature during the eight year period prior to Richmond's death. Other evidence showed that plaintiff and Richmond never lived together, although they did have sexual relations. After a jury trial, verdict was for plaintiff in the amount of $1,350,000.00. (Richmond left an estate valued at $7,323,000.00). On appeal, Court noted that while an oral promise to make a will is not binding under Massachusetts law, plaintiff can recover the fair market value of her services if the oral agreement is found to be legal and not contrary to public policy. The Court ruled that because the terms of the contract were disputed, the question of illegality was correctly given to the jury to determine. The court then reviewed the evidence and held that based on the evidence, the jury was warranted in finding that the illicit relations were no part of the contract, and were no more than an incidental part of plaintiff's performance.

Nevertheless, although the *Latham*, *Tyranski* and *Green* cases preceded the *Marvin* decision's ruling that agreements between non-married persons to share property can be enforced in court, even where the primary consideration of one party consists of household services, it was the

*Marvin* case which first detailed at length the various remedies which could be applied to such cases.

In *Marvin*, plaintiff and defendant had lived together for seven years; for the first three of these years, defendant was still married to his first wife, but he did eventually obtain a divorce. Plaintiff's complaint alleged that she had agreed to "give up her lucrative career as an entertainer [and] singer" in order to "devote her full time to defendant ... as a companion, homemaker, housekeeper, and cook." In return, defendant agreed to "provide for all of plaintiff's financial support and needs for the rest of her life." It was further alleged that during the relevant time period, as a result of the parties' joint efforts, defendant acquired in his name $1 million in real and person property. The trial court granted defendant judgment on the pleadings; on appeal, the California Supreme Court reversed, holding that the facts alleged by plaintiff were sufficient to state a cause of action based on an express contract. In so holding, the Court recognized that personal services are sufficient consideration for such a contract and that this aspect of the consideration was severable from any other part of the consideration which might be based on sexual services.

Of even more interest in *Marvin* is the Court's discussion of the theories of implied contract or equitable relief. The *Marvin* Court noted that while the courts in California have enforced express contracts between nonmarital partners, the courts have refused to enforce implied contracts arising in the same situation, and instead have "left the parties as they found them". The Court further noted that in some cases, the courts have permitted a partner to recover a proportionate share in the acquisition, despite the "lack of legal standing of the relationship", *Id.* 18 Cal.3d at 679, 134 Cal.Rptr. at 828, 557 P.2d at 119, yet the courts have refused to recognize the same type of interest based upon the contribution of services. The *Marvin* court disapproved of both of these disparities. The Court wrote:

The principal reason why the [prior California] decisions result in an unfair distribution of property inheres in the

court's refusal to permit a nonmarital partner to assert rights based upon accepted principles of implied contract or equity. We have examined the reasons advanced to justify this denial of relief, and find that none have merit.

. . . . .

Concepts of "guilt" thus cannot justify an unequal division of property between two equally "guilty" person.

. . . . .

There is no more reason to presume that services are contributed as a gift than to presume that funds are contributed as a gift; in any event the better approach is to presume, a Justice Peters suggested, "that the parties intend to deal fairly with each other."

*Id.* at 682, 134 Cal.Rptr. at 830, 577 P.2d at 121.

(footnote omitted) (citation omitted)

The *Marvin* court concluded by ruling that in addition to express and implied contracts, or implied agreements of partnership or joint venture, other traditional equitable remedies should be considered, such as constructive trust, resulting trust or in quantum meruit for the reasonable value of household services rendered less the reasonable value of support received, where it is shown that services were rendered with the expectation of monetary reward.[5]

In the seven years since the *Marvin* decision, many other jurisdictions have been faced with similar disputes. Most courts have ruled that express, oral agreements, if proved, will be enforced by the courts. *Poe v. Estate of Levy,* Fla.App., 411 So.2d 253 (1982); *Glasgo v. Glasgo,* 78 Ind. Dec. 477, 410 N.E.2d 1325 (1980); *Donovan v. Scuderi,* 51 Md.App. 217, 443 A.2d 121 (1982); *Carnes v. Sheldon,* 109 Mich.App. 204, 311 N.W.2d 747 (1981); *Carlson v. Olson,*

---

5. Ironically, while the *Marvin* case is popularly viewed as the initiator of so called "palimony", in fact the plaintiff, Michele Marvin, ultimately, after the case was remanded, ended up recovering not one penny. The trial court found that plaintiff failed to prove either that some type of agreement existed or that she was in any way economically damaged or that defendant was unjustly enriched. These findings were affirmed by the Court of Appeal at *Marvin v. Marvin,* 122 Cal.App.3d 871, 176 Cal.Rptr. 555 (1981).

Minn., 256 N.W.2d 249 (1977); *Kinkenon v. Hue*, 207 Neb. 698, 301 N.W.2d 77 (1981); *Kozlowski v. Kozlowski*, 80 N.J. 378, 403 A.2d 902 (1979); *Dominguez v. Cruz*, 95 N.M. 1, 617 P.2d 1322 (1980); *Morone v. Morone*, 50 N.Y.2d 481, 429 N.Y.S.2d 592, 413 N.E.2d 1154 (1980); *Beal v. Beal*, 282 Or. 115, 577 P.2d 507 (1978). *See also, Matter of Estate of Steffes*, 95 Wis.2d 490, 290 N.W.2d 697 (1980) (Court rules that evidence supports a finding of contract implied in fact or implied in law and court also voices approval of express contracts under the same circumstances.) It is the general view that an agreement to accumulate or transfer property and the legally viable consideration, such as household or personal services, upon which the agreement is based can be enforced to the extent that the contract is independent of any agreement to pay for sexual services.

Of the courts cited above, however, some have ruled that, while they will enforce an express contract, an implied contract will not be enforced by their courts. *Carnes v. Sheldon, supra* (Implied in fact contracts will not be found to allow recovery for "household" services but may be found for "services of a commercial nature."); *Morone v. Morone, supra*. The rationale given by these courts for this distinction was the belief that to recognize an implied contract between non-married persons living together would effectively revive the concept of common law marriage, abolished in those states by the legislature. Thus, these courts felt that the public policy against common law marriage would be violated by an implied contract. But this rationale appears to raise as many issues as it answers, for in one of these two cases the parties would in any event have been incapable of contracting a common law marriage because they were not yet divorced from their estranged spouses when they began living with, and allegedly contracting with, the other party to the action then before the courts. *See Carnes v. Sheldon, supra*. By contrast, other courts have not been troubled by this distinction and have found implied contracts neither to be against public policy nor a revival of common law marriage, also abolished by the

legislatures of their respective states. *Glasgo v. Glasgo, supra; Beal v. Beal, supra; Matter of Estate of Steffes, supra.*

There are only two jurisdictions which we have found that completely refuse recovery of any sort on public policy grounds. The first of these is *Rehak v. Mathis*, 239 Ga. 541, 238 S.E.2d 81 (1977), where, despite the fact that the plaintiff had contributed more than one-half of the purchase price for the house which the parties' lived in for over eighteen years, the court affirmed a summary judgment in favor of the defendant on the grounds that the contract was founded on illegal or immoral consideration. *Contra Brooks v. Kunz*, Mo.App. 597 S.W.2d 183 (1980), wherein the court, under comparable facts, ordered partition of property proportionate to the contributions of the parties. *See also* Pennsylvania cases cited at 560, *infra.*

The other jurisdiction denying recovery is Illinois. In *Hewitt v. Hewitt*, 77 Ill.2d 49, 31 Ill.Dec. 827, 394 N.E.2d 1204 (1979), the court expressed concern over the impact of cohabitation by non-married persons on society and the institution of marriage. The court posited the query whether recognizing legal rights between parties to "what have heretofore been commonly referred to as 'illicit' or 'meritricious' relationships encourage[s] formation of such relationships and weaken[s] marriage as the foundation of our family-based society." *Id.* at 58, 31 Ill.Dec. 827, 394 N.E.2d 1204. Thus, the court wrote, "The issue, realistically, is whether it is appropriate for this court to grant a legal status to a private arrangement substituting for the institution of marriage sanctioned by the State." *Id.* at 61, 31 Ill.Dec. 827, 394 N.E.2d 1204. While the court implied that it found such relationships to be immoral, the court's ruling was that such suits would not be permitted because to rule otherwise would in effect reinstate common law marriage, abolished by the legislature, and thus would contravene public policy.

The *Hewitt* decision has been rejected as harsh, *Glasgo v. Glasgo, supra,* and in view of the facts in *Hewitt* we agree

with this characterization. In *Hewitt*, the parties cohabited for more than fifteen years and raised three children. When plaintiff first became pregnant, defendant told her that no formal ceremony was necessary because they were already husband and wife. In reliance on defendant's promise to "share his life, his future, his earnings, and his property" with her, plaintiff worked to put defendant through school and even obtained financial assistance from her parents for this purpose. At the time suit was filed defendant was earning $80,000.00 per year and had accumulated large amounts of property, which he owned either jointly with plaintiff or separately.

■ In criticising the *Hewitt* decision, the *Glasgo* court wrote:

Unlike the Illinois court, however, we are not convinced that the impact of the recognition of relationships such as the Hewitts' or the Glasgos' upon our society and the institution of marriage to be of greater importance than the rights of the immediate parties. *The strength and endurance of the Anglo-American judicial system has been in just this characteristic, viz., its flexibility as a court of equity to afford and shape individualized relief in the interest of justice when a court of law could not.* Therefore, whether or not the common law marriage concept would have been applicable in this case absent its legislated demise has little relevance. *As pointed out by the Minnesota Supreme Court, legislative abolition of the common law marriage doctrine has obviously not eliminated the institution, but only the rules which apply to it. Carlson v. Olson, supra,* ..... *In the absence of this doctrine courts have applied other traditional common law and equitable principles.*

410 N.E.2d at 1330. (citations omitted). (emphasis added).

We agree with the *Glasgo* court.

■ Returning now to appellant's contention that the agreement at issue violates Pennsylvania public policy, we

rule that it does not. We are in accord with the majority of courts from other jurisdictions in that we hold that agreements between nonmarried cohabitors fail only to the extent that they involve payment for sexual services. An individual cannot sue for such payment nor can one sue to enforce an agreement to provide sexual services. But on the other matters, the parties can contract and bring suit for breach. Furthermore, we do not view this as a way of effectively creating a common law marriage where there is none. While the damages awarded under an implied contract between cohabitors may to some extent parallel a property settlement following a divorce, the two are not the same. Parties to a common law marriage are legally married in Pennsylvania and can, by virtue of their status as spouses, make claims to property even absent an agreement. Cohabitors, on the other hand, acquire no automatic claims to property from cohabitation.

■ Additionally, we find no public policy in Pennsylvania against entertaining suits between non-married cohabitors in property disputes. While, admittedly, suit on an express contract between such parties is a recent development, the premise of this cause of action is consistent with our earlier cases which permitted non-married cohabitors to sue in equity for a partition of property.

### III.

Appellant next contends that any oral agreements between the parties concerning profits from the sale of real estate fall within the Statute of Frauds and are not enforceable. Appellant's position is without support in the law.

The Statute of Frauds provides:

From and after April 10, 1772, all leases, estates, interests of freehold or term of years, or any uncertain interest of, in, or out of any messuages, manors, lands, tenements or hereditaments, made or created by livery and seisin only, or by parol, and not put in writing, and signed by the parties so making or creating the same, or their agents, thereunto lawfully authorized by writing,

shall have the force and effect of leases or estates at will only, and shall not, either in law or equity, be deemed or taken to have any other or greater force or effect, any consideration for making any such parol leases or estates, or any former law or usage to the contratry notwithstanding; except, nevertheless, all leases not exceeding the term of three years from the making thereof; and moreover, that no leases, estates or interests, either of freehold or terms of years, or any uncertain interest, of, in, to or out of any messuages, manors, lands, tenements or hereditaments, shall, at any time after the said April 10, 1772, be assigned, granted or surrended, unless it be by deed or note, in writing, signed by the party so assigning, granting or surrendering the same, or their agents, thereto lawfully authorized by writing, or by act and operation of law.[6]

It's well settled that the purpose of the Statute of Frauds is to prevent assertion of verbal understandings in the creation of interests or estates in land and to obviate the opportunity for fraud and perjury regarding said estates. *Simplex Precast Industries, Inc. v. Biehl*, 395 Pa. 105, 149 A.2d 121 (1959); *Haines v. Minnock Construction Co.*, 289 Pa.Superior Ct. 209, 433 A.2d 30 (1981).

At issue in the instant case, however, is not title to real estate but is an agreement to share in the accumulated wealth accrued during the pendency of the parties' cohabitation. While part of this accumulated wealth consists of profits from the sale of real estate, the court's division of these profits does not violate the Statute of Frauds. Oral agreements to share in profits from the sale of real estate can be enforced after the realty has been sold. *Smith v. Brown*, 294 Pa. 213, 143 A. 913 (1928); *Davis v. Hillman*, 288 Pa. 16, 135 A. 254 (1926); *Edgcomb v. Clough*, 275 Pa. 90, 118 A. 610 (1922); *McBride v. Western Pennsylvania Paper Co.*, 263 Pa. 345, 106 A. 720 (1919); *Howell v. Kelly*, 149 Pa. 473, 24 A. 224 (1892); *Everhart's Appeal*, 106 Pa. 349 (1884); *Benjamin v. Zell*, 100 Pa. 33

6. The Act of March 21, 1772, 1 Sm.L. 389, § 1, 33 P.S. § 1 (1967).

(1882). Therefore, we find no merit in appellant's argument.

## IV.

Appellant also argues that appellee did not prove by substantial evidence, the existence, terms and breach of the oral agreement. On the subject of oral contracts, the Supreme Court has stated:

In the case of a disputed oral contract there is a well marked distinction between the relative functions of court and jury. There are three successive stages of inquiry; first, what were the terms of the contract; second, what was the understanding of the parties as expressed by those terms; third, what was the legal effect of the agreement as thus determined and interpreted. The authorities are clear to the effect that the first two of these processes are for the jury as questions of fact; the last is for the court as a matter of law.

*McCormack v. Jermyn,* 351 Pa. 161, 164–165, 40 A.2d 477, 479 (1945) (emphasis in original.) *See also Lucacher v. Kerson,* 355 Pa. 79, 48 A.2d 857 (1946); *Solomon v. Luria,* 213 Pa.Superior Ct. 87, 246 A.2d 435 (1968); *Kirk v. Brentwood Manor Homes, Inc.,* 191 Pa.Superior Ct. 488, 159 A.2d 48 (1960); *Curtin v. Marson,* 185 Pa.Superior Ct. 194, 138 A.2d 149 (1958).

The Court further said in *McCormack:*

In performing its duty of determining the factual meaning of an oral contract what is the standard of interpretation to be observed by the jury? A verbal agreement differs from a written one in this, that in the construction of the latter all negotiations leading up to the contract are presumed to be merged in the writing; moreover, oral testimony is not admissible to explain the written document in the absence of an ambiguity requiring such explanation. *But in an unwritten contract, where the words constituting the agreement are merely parts of, and embedded in, a general conversation, the scope of interpretation is more extended,* and indeed, even in the case of a written contract, the agreement, if there is any

doubt about its meaning, must be interpreted "with reference to the circumstances under which the parties contract and in the light of the objects to be accomplished" ... In construing an oral contract the question is always, what meaning is to be ascribed to the words employed, in the light of all the circumstances surrounding the agreement when it was made? While words are prima facie to be given their normal meaning, this does not necessarily obtain when the context of the conversation and the surrounding circumstances show that a different meaning was intended. However broad may be the apparent terms of the agreement, it extends only to those things concerning which the parties intended to contract, and the subject-matter of their negotiations may affect the meaning of the words they employ, especially if, in connection with that subject-matter, the conventional interpretation would give an unreasonable or absurd result. The meaning of words in ordinary speech is rarely rigid and inflexible.

*Id.* 35 Pa. at 166–167, 40 A.2d at 480. (citations omitted) (emphasis added).

Using the above test, we find appellant's argument to be without merit. It was for the jury to determine the terms of the contract—the offer, acceptance and consideration—and the jury apparently credited appellee's testimony to the effect that appellant offered to share all the accumulated assets if appellee would live with him and act as "a homemaker, a mother to his children, a partner, a hostess." We reject appellant's further claims that the terms of the contract were too vague,[7] that the only consideration promised was sexual services, or that no breach was

7. The case cited by appellant for this argument is *Seiss v. McClintic-Marshall Corp.,* 324 Pa. 201, 188 A. 109 (1936). In *Seiss,* the plaintiff, an injured employee, alleged that the defendant employer promised to provide "suitable employment ... for life." The Supreme Court found, *inter alia,* that the term "suitable employment" was too vague to be enforced, and that the contract was vague because the rate of pay was not specified. We find the *Seiss* case to be distinguishable for we find both aspects of the consideration promised to be sufficiently clear to be enforced.

proven. We also reject appellant's claim that appellee suffered no damages. The evidence supported a finding that appellee performed many services for appellant but that appellant refused to satisfy his agreement to share the accumulated assets.[8]

We do not mean by this opinion to in any way reflect a diminution of the sanctity of marriage, which brings to society an orderliness and stability which no other social institution can bring. All we say is that two adults not married to each other, who agree to establish a financial and economic relationship based on adequate consideration which is not predominantly based on sexual consideration create an agreement cognizable and binding in law.

Affirmed.

<hr />

---

**8.** Appellant additionally sought to argue the inadequacy of the court's charge to the jury, but we find this argument to be waived by appellant's failure to first raise this issue at trial. *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974).