

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-20-2003

# Standard Bent Glass v. Glassrobots OY

Precedential or Non-Precedential: Precedential

Docket No. 02-2169

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Standard Bent Glass v. Glassrobots OY" (2003). *2003 Decisions.* Paper 405.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/405

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed June 20, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-2169

STANDARD BENT GLASS CORP.,
Appellant

v.

GLASSROBOTS OY,
a Corporation Registered in Finland

On Appeal from the United States District Court
for the Western District of Pennsylvania
D.C. Civil Action No. 00-cv-02423
(Honorable Maurice B. Cohill, Jr.)

Argued February 28, 2003

Before: SCIRICA, *Chief Judge*,* GREENBERG and
GIBSON,** *Circuit Judges*

(Filed June 20, 2003)

---

* Judge Scirica began his term as Chief Judge on May 4, 2003.

** The Honorable John R. Gibson, United States Circuit Judge for the
Eighth Judicial Circuit, sitting by designation.

RONALD T. ELLIOTT, ESQUIRE
 (ARGUED)
THOMAS W. KING, III, ESQUIRE
Dillon, McCandless, King, Coulter
 & Graham
128 West Cunningham Street
Butler, Pennsylvania 16001

Attorneys for Appellant

THOMAS J. SWEENEY, JR.,
 ESQUIRE (ARGUED)
DANIEL P. ORIE, ESQUIRE
Eckert, Seamans, Cherin & Mellott
600 Grant Street, 44th Floor
Pittsburgh, Pennsylvania 15219

Attorneys for Appellee

---

## OPINION OF THE COURT

---

SCIRICA, *Chief Judge*.

On appeal is a motion to compel arbitration in a commercial dispute. At issue are principles of contract formation under the Uniform Commercial Code.

## I.

### A.

Standard Bent Glass, a Pennsylvania corporation, set out to purchase a machine for its factory that would produce cut glass, and in March 1998, commenced negotiations with representatives of Glassrobots Oy, a Finnish corporation. On March 19, 1998, Glassrobots tendered a written offer to sell Standard Bent Glass a glass fabricating system. The initial offer was rejected but negotiations continued and, in February 1999, reached a critical juncture. On February 1, Standard Bent Glass faxed an offer to purchase a glass fabricating system from Glassrobots.[1] The offer sheet commenced, "Please find

---

1. The specific offer was for the purchase of a glass bending and tempering furnace and a flat laminating line 200/400.

below our terms and conditions related to ORDER # DKH2199," and defined the items to be purchased, the quantity, the price of $1.1 million, the payment terms, and installation specifics, instructions, and warranties. The letter concluded, "Please sign this ORDER and fax to us if it is agreeable."

On February 2, Glassrobots responded with a cover letter, invoice, and standard sales agreement. The cover letter recited, in part: "Attached you'll find our standard sales agreement. Please read it through and let me know if there is anything you want to change. If not, I'll send you 2 originals, which will be signed." Glassrobots did not return, nor refer to, Standard Bent Glass's order.

Later that day, Standard Bent Glass faxed a return letter that began, "Please find our changes to the Sales Agreement," referring to Glassrobots's sales agreement. The letter apparently accepted Glassrobots's standard sales agreement as a template and requested five specific changes. The letter closed, "Please call me if the above is not agreeable. If it is we will start the wire today."

The five changes addressed using a wire transfer in lieu of a letter of credit, payment terms, late penalty for shipment delays, site visits, and technical specifications. All were straightforward modifications and spelled out in the Standard Bent Glass letter. On February 4, Standard Bent Glass wired the down payment to Glassrobots. On February 8, the wire transfer cleared Glassrobots's bank account.

On February 5, Glassrobots sent Standard Bent Glass a revised sales agreement. The revised agreement incorporated nearly all of the requested changes, except for the late penalty for shipment delays. Also, the revised agreement did not mirror the payment terms requested by Standard Bent Glass (although the payment terms were altered in Standard Bent Glass's favor).

Glassrobots's cover letter accompanying the revised agreement recited, "Attached you'll find the revised sales agreement. . . . Please return one signed to us; the other one is for your files." Section 12.1 of the standard sales agreement provided that "[t]his Agreement shall come into

force when signed by both parties." Standard Bent Glass never signed the agreement.

On February 9, Standard Bent Glass sent another fax to Glassrobots: "Just noticed on our sales agreement that the power is 440 ± 5. We must have 480 ± 5 on both pieces of equipment." There was no further written correspondence after February 9. No contract was ever signed by both parties. Nevertheless, the parties continued to perform. Glassrobots installed the glass fabricating system. On August 5, both parties signed the Acceptance Test Protocol, which stated: "We undersigners hereby certify the performance and acceptance test according to the Sales Agreement TSF II 200/320 between Standard Bent Glass Corp., USA and Glassrobots Oy has been carried out. All the equipment fulfill the conditions mentioned in the same Agreement, in quality an [sic] quantity." In November 1999, Standard Bent Glass made its final payment to Glassrobots.

Subsequently, Standard Bent Glass noticed defects in the equipment. The parties disputed the cause of the defects, and on November 8, 2000, Standard Bent Glass filed a complaint against Glassrobots in state court. After removal to federal court, Glassrobots filed a motion to compel arbitration under an appendix to the standard sales agreement that Standard Bent Glass claims it never received. The District Court granted Glassrobots's motion and Standard Bent Glass appealed.[2]

## B.

At issue is whether there was a valid agreement and whether that agreement contained a binding arbitration clause. Glassrobots's standard sales agreement included three references[3] to industry guidelines known as Orgalime

---

2. We review de novo the District Court's interpretation of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards. *Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*, 186 F.3d 210, 215 (2d Cir. 1999) ("The district court's construction of the Convention, like the construction of any statute, is a matter of law which we review de novo.").

3. The cover letter to the standard sales agreement referred to the enclosure of certain appendices, including Orgalime S92. Section 11.1 of

S92, which recites "General Conditions for the Supply of Mechanical, Electrical, and Associated Electronic Products."[4] Section 44 of Orgalime S92 provided a binding arbitration clause for all contractual disputes:

> All disputes arising in connection with the contract shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said rules, supplemented as necessary by the procedural rules of the law of the country of the Supplier's place of business most closely connected with the contract.

The standard sales agreement also contained a reference to binding arbitration in section 6.2 ("Completion Date"): "When the above has been satisfactorily fulfilled, both parties will agree in writing upon the Completion Date as being the date of the Acceptance Test. In the event that the parties cannot agree as to the Completion Date, the matter shall be submitted to arbitration as set out later in this Agreement."

Standard Bent Glass admits it received the standard sales agreement. But Standard Bent Glass denies the Orgalime S92 appendix was attached to the standard sales agreement, contending it received the appendix after the February 1999 negotiation period.[5]

---

the agreement provided: "As to the other conditions shall apply Orgalime S92 General Conditions for the Supply of Mechanical, Electrical and Associated Electronic Products." Section 13 listed the annexes to the agreement, including "Appendix VI Orgalime S92."

4. Juha Karisola, the Glassrobots managing director, averred that "Orgalime is the European Federation of National Industrial Associations representing the European mechanical, the [sic] electrical, electronic and metal article industries. The Orgalime S92 General Conditions are frequently used in international trade and are commonly incorporated, in whole or in part, into Glassrobots' international contracts."

5. Michael Hartley, president of Standard Bent Glass, averred that "[t]he Orgalime S92 document was never provided to me by Glassrobots or anyone else and that I have never seen or read the Orgalime S92 document until sometime after February/March of 2000." Moreover, Hartley maintained he disliked arbitration clauses and "[sought] to avoid any provisions in contracts which require arbitration."

## II.

As noted, the District Court granted Glassrobots's motion to compel arbitration. Based on its application of contract principles, the court found "the agreement of the parties is represented by the February 5, 1999 Sales agreement." The court then examined whether that agreement included a binding arbitration clause. The court noted but declined to credit Standard Bent Glass's denial it had ever received the Orgalime S92 appendix to the sales agreement, which purportedly included the arbitration clause.[6] Based on multiple references in the revised sales agreement to Orgalime S92, and its arbitration clause, the court found the parties' conduct "affirmatively manifests the parties' consent to the arbitral clause contained in the Sales Agreement."

## A.

Because this dispute involves the sale of goods, the Uniform Commercial Code applies, specifically 13 Pa.C.S. section 2207 (adopting UCC section 2-207). The UCC addresses "the sad fact that many . . . sales contracts are not fully bargained, not carefully drafted, and not understandingly signed by both parties." 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 1-3, at 6 (4th ed. 1995). In these cases, we apply UCC section 2-207 to ascertain the terms of an agreement. *Step-Saver Data Sys., Inc. v. Wyse Tech. & The Software Link,* 939 F.2d 91, 98 (3d Cir. 1991).[7]

---

6. Whether Standard Bent Glass received the Orgalime S92 appendix is an issue of fact. We believe, therefore, the District Court should not have "decline[d] to credit" Standard Bent Glass's claim at this stage of the proceedings.

7. Pennsylvania adopted UCC section 2-207 in its entirety. *See* 13 Pa.C.S. § 2207. With diversity jurisdiction, we will apply the choice of law provision of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496 (1941); *Woessner v. Air Liquide, Inc.,* 242 F.3d 469, 472 (3d Cir. 2001). Because performance occurred in Pennsylvania, we apply Pennsylvania law. *See Knauer v. Knauer,* 470 A.2d 553, 557-58 (Pa. Super. Ct. 1983) (noting relevant factors in determining the law applicable to an issue). The United Nations Convention on the

The UCC, as adopted by Pennsylvania, recognizes a party's acceptance of a contract through performance and does not require a signed agreement. Under UCC section 2-201(3)(a), a party's partial performance removes an agreement from the Statute of Frauds. In a commercial transaction involving the sale of goods, where the parties' performance demonstrates agreement, we look past disputes over contract formation and move directly to ascertain its terms:

> We see no need to parse the parties's various actions to decide exactly when the parties formed a contract. . . . The parties's performance demonstrates the existence of a contract. The dispute is, therefore, not over the existence of a contract, but the nature of its terms. When the parties's conduct establishes a contract, but the parties have failed to adopt expressly a particular writing as the terms of their agreement, and the writings exchanged by the parties do not agree, UCC § 2-207 determines the terms of the contract.

*Step-Saver,* 939 F.2d at 98.

Standard Bent Glass contends it never agreed to a contract with Glassrobots, pointing to the lack of a signed agreement and the failure of the parties to achieve a meeting of the minds on all contract provisions. Notwithstanding this argument, the parties here completed performance. Glassrobots fully installed the glass fabrication equipment in Standard Bent Glass's factory. Standard Bent Glass made its final contractual payment to Glassrobots in November 1999. Because the parties' performance establishes a contract, we will apply UCC section 2-207 to ascertain the contract's terms.

---

International Sale of Goods, 15 U.S.C. App., Art. 1(1)(a), generally governs contracts for the sale of goods between parties whose place of business is in nations that are signatories to the treaty, absent an express choice of law provision to the contrary. The United States is a signatory to the CISG, but Finland is not a signatory to the portion of the CISG, Art. 92, that governs contract formation. Because the parties have not raised the CISG's applicability to this dispute, we decline to address it here.

## B.

Under UCC section 2-207(1), the offeree's expression of acceptance or transmission of a written confirmation generally results in the formation of a contract.[8] This is true unless the offeree makes that expression or confirmation "expressly conditional" on the offeror's assent to the proposed additional or different terms.

The flexibility permitted under section 2-207 allows parties to begin performance expediently rather than wait for all contract details to be resolved. This structure is well suited to the fast-paced environment of commercial dealings. Where parties perform but do not explicitly agree on a single uniform document, sections 2-207(2) and (3) govern proposed additional or different terms to the contract.

Here, Standard Bent Glass initiated written negotiations between the parties on February 1. This exchange represented an offer from Standard Bent Glass to purchase the glass fabricating machine from Glassrobots. The

---

8. UCC § 2-207 provides:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

  (a) the offer expressly limits acceptance to the terms of the offer;

  (b) they materially alter it; or

  (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Title.

Standard Bent Glass offer contained a set of terms and conditions. On February 2, Glassrobots responded by enclosing its standard sales agreement, which contained a different set of terms and conditions. Later that day, Standard Bent Glass sent its own response, accepting the terms of the Glassrobots standard sales agreement and proposing five specific modifications. Referring to the Glassrobots agreement, the Standard Bent Glass letter began, "Please find our changes to the Sales Agreement."

This communication from Standard Bent Glass constituted either: (1) a definite and seasonable expression of acceptance under section 2-207(1); (2) a counteroffer; or (3) a rejection followed by conduct by both parties sufficient to recognize a valid contract under section 2-207(3). By using the Glassrobots standard sales agreement as a template and by authorizing a wire transfer of the down payment, Standard Bent Glass demonstrated its intent to perform under the essential terms of Glassrobots's standard sales agreement. Accordingly, its response was a definite and seasonable expression of acceptance of Glassrobots's offer.

Noteworthy was Standard Bent Glass's own immediate performance on the February 2 agreement. On February 4, Standard Bent Glass initiated a wire transfer to Glassrobots for the down payment. The following day, Glassrobots adopted most, but not all, of the proposed modifications, and began to perform on the agreement. This was the last significant exchange of written documents between the parties. The parties continued to perform, with Glassrobots constructing and installing the desired equipment and Standard Bent Glass timely paying for it.

In sum, Standard Bent Glass's conduct constituted a definite and seasonable expression of acceptance that evinced the formation of a contract rather than a counteroffer or rejection. For these reasons, there was a valid contract on the Glassrobots terms of February 2 that incorporated any non-material additions proposed by Standard Bent Glass.[9]

---

9. Standard Bent Glass's proposed changes represented additional or different terms to the contract, to be interpreted under section 2-207(2) in the case of a future dispute. Whether they are part of the parties' agreement is not relevant here.

## C.

The remaining question is whether the contract included the Orgalime S92 arbitration clause. Arbitration clauses must be clear and unequivocal. Genuine issues of fact will preclude an order to arbitrate. *See* 8-38 James Wm. Moore et al., *Moore's Federal Practice — Civil* § 38.33 (3d ed. 2003). As we have stated:

> Before a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect. If there is doubt as to whether such an agreement exists, the matter, upon a proper and timely demand, should be submitted to a jury. Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement.

*Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 106 (3d Cir. 2000) (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980)).

On this point, the threshold issue is whether Standard Bent Glass acceded to a binding arbitration clause. As noted, under UCC section 2-207(1), the Standard Bent Glass response of February 2 constituted a definite and seasonable expression of acceptance of the Glassrobots offer. Where a buyer makes a definite and seasonable expression of acceptance of a seller's offer, a contract is formed on the seller's terms. The contract may include additional or different non-material terms proposed by either party, depending on whether the other party formally objects to the terms.

The seller's terms may include documents or provisions incorporated by reference into the main agreement. Traditional documents incorporated by reference into contracts include accepted industry guidelines or parallel agreements between the parties. Incorporation by reference is proper where the underlying contract makes clear reference to a separate document, the identity of the

separate document may be ascertained, and incorporation of the document will not result in surprise or hardship.[10]

Here, on February 2, Glassrobots sent its standard sales agreement to Standard Bent Glass. That agreement contained references to Orgalime S92, which included the arbitration clause, as well as an explicit reference to arbitration as the method of dispute resolution. First, the cover letter to the agreement referred to the enclosure of certain appendices, including Orgalime S92. Second, section 6.2 provided that, if the parties could not agree to a completion date, "the matter shall be submitted to arbitration as set out later in this Agreement." Third, section 11.1 expressed that "[a]s to the other conditions

---

10. Under the common-law rule, "the paper to be incorporated into a written instrument by reference must be so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt." *PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) ("While a party's failure to read a duly incorporated document will not excuse the obligation to be bound by its terms, a party will not be bound to the terms of any document unless it is clearly identified in the agreement."). Where a seller attempts to incorporate a 207-page booklet into a one-page contract, and then tries to avail itself of an arbitration clause buried on page 66 of the booklet, with no other mention of arbitration, the common-law rule protects the buyer from a clause that was not properly incorporated by reference. *See Weiner v. Mercury Artists Corp.*, 130 N.Y.S.2d 570, 571 (N.Y. App. Div. 1954) (rejecting incorporation by reference where reference was not clear); 11 Richard A. Lord, *Williston on Contracts* § 30.25 (4th ed. 1999) ("So long as the contract makes clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt, the parties to a contract may incorporate contractual terms by reference to a separate, noncontemporaneous document, including a separate agreement to which they are not parties, and including a separate document which is unsigned.").

At first blush, this approach seems harsh, especially if a party claims it never received an incorporated document. If the matter here involved a non-merchant individual as the product buyer, or if the reference to arbitration had been buried, the analysis might very well be different. But the goal of commercial contract law is to efficiently facilitate business transactions between seasoned merchants. It is appropriate to require a merchant to exercise a level of diligence that might not be appropriate to expect of a non-merchant.

shall apply Orgalime S92 General Conditions for the Supply of Mechanical, Electrical and Associated Electronic Products." Finally, section 13 listed Orgalime S92 as one of the appendices to the agreement.

Although proposing five changes to the standard sales agreement, Standard Bent Glass did not alter or respond to any of the references to the Orgalime S92 arbitration clause. On February 5, Glassrobots provided Standard Bent Glass with a revised sales agreement that included the same four references. Standard Bent Glass should have advised Glassrobots it had not received Orgalime S92, if that were the case. Its failure to object to the arbitration terms of Orgalime S92, absent surprise or hardship, makes those terms part of the contractual agreement.

## D.

Even in a commercial transaction, a provision will not be incorporated by reference if it would result in surprise or hardship to the party against whom enforcement is sought. Standard Bent Glass has not demonstrated surprise nor hardship. According to the Karisola affidavit, unrefuted by Standard Bent Glass, the Orgalime S92 arbitration provision accords with industry norms. The Orgalime S92 general conditions are frequently used in international trade and the submission of disputes to arbitration is common industry practice. And Standard Bent Glass was represented in negotiations by its president, who averred he had "extensive experience in international trade."

Standard Bent Glass's only evidence of surprise is its president's affidavit that he never received a copy of Orgalime S92. Its only evidence of hardship is that the company disfavors arbitration clauses generally. Even viewing any factual issues in a light favorable to Standard Bent Glass, the evidence is insufficient to prove surprise or hardship. As the Court of Appeals for the Second Circuit recently stated:

> Surprise includes both a subjective element of what a party actually knew and an objective element of what a party should have known. . . . A profession of surprise and raised eyebrows are not enough. Instead,

> to carry its burden the nonassenting party must establish that, under the circumstances, it cannot be presumed that a reasonable merchant would have consented to the additional term.

*Aceros Prefabricados, S.A. v. TradeArbed, Inc.*, 282 F.3d 92, 100 (2d Cir. 2002) (quotations omitted).[11]

The Orgalime S92 arbitration clause was incorporated in the Glassrobots counter-offer of February 2.[12] Standard Bent Glass demonstrated a definite and seasonable expression of acceptance as to this offer and both parties performed on their contractual relationship. The arbitration clause is incorporated by reference into the parties' contract.

## III.

An arbitration provision in an international commercial agreement is governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("CREFAA"). Where a dispute arises from an international commercial agreement, a court must address

11. The Court of Appeals for the Second Circuit expressly rejected Aceros's claim that "surprise and hardship are self-evident where, as here, there was no reference to nor mention [of] arbitration until after suit was filed." *Aceros Prefrabricados*, 282 F.3d at 101. Here, the Glassrobots standard sales agreement contained four references to the Orgalime S92 arbitration clause.

12. Even if we did not incorporate by reference the arbitration clause, the clause did not constitute a "material alteration" of the parties' contractual relationship. Under UCC section 2-207(2)(b), absent objection, additional terms become part of the contract unless "they materially alter it." A material alteration is one that would "result in surprise or hardship if incorporated without express awareness by the other party." *Aceros Prefabricados*, 282 F.3d at 100 (quoting UCC § 2-207 cmt. 4). Here, Standard Bent Glass admits it received the Orgalime S92 document at some point during the year 2000, while the parties' relationship remained ongoing and prior to the commencement of the instant dispute. Therefore, we might construe the arbitration clause as an additional term proposed by Glassrobots and not objected to by Standard Bent Glass. As noted, it does not appear the outcome of arbitration would result in surprise or hardship to Standard Bent Glass.

four factors to determine whether the arbitration agreement falls under CREFAA. If the answers are all in the affirmative, the court must order arbitration unless it determines the agreement is null and void. *Ledee v. Ceramiche Ragno*, 684 F.2d 184, 186-87 (1st Cir. 1982). The first of these questions, whether there is "an agreement in writing to arbitrate the subject of the dispute," is at issue.[13] Convention on the Recognition and Enforcement of Foreign Arbitral Awards, art. II, § 2; 9 U.S.C. §§ 201-208. Article II, section 2 of CREFAA provides: "The term 'agreement in writing' shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams."

The parties stipulate they did not sign an agreement in writing. At issue is whether an arbitral clause was contained in the exchange of letters that occurred. The answer depends on article II of CREFAA.

Two courts of appeals have addressed this issue but analyzed the relevant section differently. In *Sphere Drake Insurance PLC v. Marine Towing, Inc.*, 16 F.3d 666, 669 (5th Cir. 1994), the Court of Appeals for the Fifth Circuit interpreted article II, section two as imposing the signature and exchange of letters requirements only where the parties' consent to arbitrate is evidenced by an independent agreement to arbitrate, and not an arbitral clause in a contract. In *Kahn Lucas Lancaster, Inc. v. Lark International Ltd.*, 186 F.3d 210 (2d Cir. 1999), the Court of Appeals for the Second Circuit disagreed, holding that the modifying phrase "signed by the parties or contained in an exchange of letters or telegrams" applied to both "an arbitral clause

---

13. Questions two through four are not pertinent here. Those questions are: "(2) Does the agreement provide for arbitration in the territory of a signatory of the Convention?; (3) Does the agreement arise out of a legal relationship, whether contractual or not, which is considered as commercial?; (4) Is a party to the agreement not an American citizen, or does the commercial relationship have some reasonable relation with one or more foreign states." Both the United States and Finland are signatories to CREFAA; the agreement arises out of a commercial relationship; and Glassrobots is not an American corporation. Therefore, only question one is at issue.

in a contract" and "an arbitration agreement." *Id.* at 216-18.

We agree with the Court of Appeals for the Second Circuit. The CREFAA provision includes a comma after "arbitration agreement," demonstrating an intent to apply the signature and exchange of letters requirements to both an arbitral clause within a contract or a separate arbitration agreement. To read it otherwise would ignore the treaty's inclusion of the "arbitral clause in a contract" language. Thus, the plain language provides that an arbitration clause is enforceable only if it was contained in a signed writing or an exchange of letters.[14]

Since the parties here did not sign an agreement in writing, we look to whether the incorporated arbitration clause was contained in a series of letters. As noted, the contract here was contained in the February 2 exchange of letters. Though the arbitration clause may not have been included in that exchange, it was incorporated by reference in the letters. This is all CREFAA requires.

CREFAA reinforces a strong federal policy in favor of arbitration over litigation. This policy "applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985) (noting strong policy favoring arbitration); *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 (1974) (noting that the goal of CREFAA as well as the purpose of its implementation by Congress was "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate" are enforced); *Sandvik*, 220 F.3d at 104 ("The presumption in favor of arbitration carries 'special force' when international commerce is involved, because the United States is also a signatory to [CREFAA].") (*quoting Mitsubishi Motors*, 473

---

14. In requiring an agreement in writing, article II, section 2 of CREFAA prohibits the enforcement of an oral agreement to arbitrate an international dispute. Beyond the clear prohibition against an oral agreement, CREFAA does not require a signed writing—the agreement in writing to an arbitral clause may be unsigned if it is exchanged in a series of letters.

U.S. at 631)). Given this strong policy, the incorporation here is sufficient to satisfy CREFAA.

## IV.

The parties formed an agreement under UCC section 2-207(1) that incorporated by reference the Orgalime S92 arbitration clause. This was proper under CREFAA. For the foregoing reasons, we will affirm the judgment of the District Court.

A True Copy:
  Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*