J.A22040/14

2015 PA Super 104

| | | |
|---|---|---|
| ERIN MCDONALD, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WHITEWATER CHALLENGERS, INC., AND | : | |
| WHITEWATER CHALLENGERS OUTDOOR | : | |
| ADVENTURE CENTER, T/D/B/A | : | |
| WHITEWATER CHALLENGERS, INC., | : | |
| | : | |
| Appellants | : | No. 1221 MDA 2013 |

Appeal from the Order Entered March 28, 2013
In the Court of Common Pleas of Luzerne County
Civil Division No(s).: 6750-CV-2008

| | | |
|---|---|---|
| ERIN MCDONALD, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WHITEWATER CHALLENGERS, INC., AND | : | |
| WHITEWATER CHALLENGERS OUTDOOR | : | |
| ADVENTURE CENTER, T/D/B/A | : | |
| WHITEWATER CHALLENGERS, INC., | : | |
| | : | |
| Appellees | : | No. 1400 MDA 2013 |

Appeal from the Order Entered March 28, 2013
In the Court of Common Pleas of Luzerne County
Civil Division No(s).: 6750-CV-2008

BEFORE: PANELLA, SHOGAN, and FITZGERALD,[*] JJ.

---

[*] Former Justice specially assigned to the Superior Court.

OPINION BY FITZGERALD, J.:                    **FILED APRIL 29, 2015**

Appellant/Cross-Appellee, Erin McDonald, appeals from the order entered in the Luzerne County Court of Common Pleas denying her motion for partial summary judgment adverse to Appellees/Cross-Appellants, Whitewater Challengers, Inc., a Pennsylvania corporation, and Whitewater Challengers Outdoor Adventure Center, trading or doing business as Whitewater Challengers, Inc. (collectively, "Whitewater"). McDonald, a New York resident, suggests the trial court erred by holding Pennsylvania law— and not New York law—applies to this case. Whitewater also appeals from the order denying their motion for summary judgment. Whitewater contends the trial court erred by concluding material issues of fact existed regarding whether McDonald was economically compelled to sign the contract at issue. We hold that when a New York resident signs an exculpatory release with a Pennsylvania corporation engaged in the business of whitewater rafting in Pennsylvania and is injured while whitewater rafting, Pennsylvania law applies. We further hold that McDonald cannot invoke economic compulsion against Whitewater and that judgment should be entered in Whitewater's favor on liability. Thus, we affirm in part and reverse in part.

We state the facts as set forth by the trial court:

[McDonald] filed a complaint on [July] 24, 2008[,] alleging that on May 19, 2006, she was a school teacher employed by [t]he School of [the] Holy Child in Rye, New York.

She alleges that on [May 19, 2006], she and other School faculty members chaperoned seventy-two (72) seventh and eighth grade school children on a whitewater rafting "field trip" down a portion of the Lehigh River conducted by [Whitewater].

[McDonald's] raft struck a large rock situated in the river bed, ejecting [her] from the raft onto the rock, allegedly causing her the injuries alleged in her complaint.

[McDonald's] allegations of negligence, in paragraph 40 of her complaint, are as follows:

> 40. [Whitewater's] negligence consisted of but was not limited to the following:
>
> a. Failing to provide a river guide / instructor in [McDonald's] boat;
>
> b. Failing to provide a properly inflated raft;
>
> c. Failing to advise [McDonald] on the grade and / or class of the whitewater rapids;
>
> d. Failing to properly instruct [McDonald] on how to safely and effectively maneuver fast and difficult rapids; and
>
> e. Allowing an unsafe number of inexperienced rafters to operate a raft.

[McDonald's Compl., 7/24/08, at 9-10.]

At her place of employment, two (2) days before the excursion, [McDonald] signed [Whitewater's] form "RELEASE OF LIABILITY" . . . .

Trial Ct. Op., 9/15/10, at 1-2.

We reproduce the release in pertinent part:

**RELEASE OF LIABILITY – _READ BEFORE SIGNING_**

In consideration of being allowed to participate in any way in the Whitewater Challengers program, its related events and activities, I (print name) Erin L. McDonald the undersigned, acknowledge, appreciate, and agree, that:

1. The risk of injury from the activities involved in this program is significant, including the potential for permanent paralysis and death, and while particular skills, equipment, and personal discipline may reduce this risk, the risk of serious injury does exist; and,

2. I KNOWINGLY AND FREELY ASSUME ALL SUCH RISKS, both known and unknown, EVEN IF ARISING FROM THE NEGLIGENCE OF THE RELEASEES or others, and I assume full responsibility for my participation; and

\* \* \*

5. I, for myself and on behalf of my heirs, assigns, personal representatives and next of kin, HEREBY RELEASE, INDEMNIFY, AND HOLD HARMLESS, WHITEWATER CHALLENGERS, their officers, officials, agents and/or employees, other participants, sponsoring agencies, sponsors, advertisers, and, if applicable, owners and lessors of premises used for the activities ("Releasees"), WITH RESPECT TO ANY AND ALL INJURY, DISABILITY, DEATH, or loss or damage to person or property associated with my presence or participation, WHETHER ARISING FROM THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE, to the fullest extent permitted by law; and,

6. Any claims or disputes arising from my participation in this program shall be venued in the Luzerne County Court in the town of Wilkes-Barre, PA, or in the Supreme Court of the State of Pennsylvania.

I HAVE READ THIS RELEASE OF LIABILITY AND ASSUMPTION OF RISK AGREEMENT. I FULLY UNDERSTAND ITS TERMS AND UNDERSTAND THAT I HAVE GIVEN UP SUBSTANTIAL RIGHTS BY SIGNING IT, AND SIGN IT FREELY AND VOLUNTARILY WITHOUT ANY INDUCEMENT.

Ex. D to Whitewater's Mot. for Summ. J., 12/14/12.

On June 6, 2010, Whitewater filed a motion for summary judgment, which the court denied on September 15, 2010. Further discovery ensued, and a few years later, McDonald filed her motion for partial summary judgment and Whitewater filed a second motion for summary judgment. McDonald requested that the court void the release based on New York law. Whitewater asked the court to hold the release was valid under Pennsylvania law and to enforce the release, thus absolving it of liability.

On April 3, 2013,[1] the trial court denied McDonald's motion for partial summary judgment and Whitewater's motion for summary judgment. Order, 4/3/13. With respect to its holding that Pennsylvania law applied, the court reasoned that our Supreme Court affirmed the validity of such exculpatory releases in inherently dangerous recreational activities, such as downhill skiing. Trial Ct. Op., 4/3/14, at 2-3.[2] The trial court also refused to permit out-of-state customers of Pennsylvania recreational facilities "to bring their law with them," because of the increased "financial/liability uncertainty." *Id.* at 3. The court, however, refused to enforce the release against McDonald, finding material issues of fact existed regarding whether

---

[1] The order was served on this date pursuant to Pa.R.C.P. 236; the order was time-stamped on March 28, 2013.

[2] On March 13, 2014, this Court ordered the trial court to file a Pa.R.A.P. 1925(a) decision explaining the basis for its ruling. Order, 3/13/14. The trial court complied, and this matter is now ripe for disposition.

she was economically compelled to sign the release by the School of the Holy Child. Trial Ct. Op., 9/15/10, at 5.

On April 18, 2013, Whitewater filed a brief in support of their motion for reconsideration or appellate certification.[3]  On April 25, 2013, McDonald filed a motion for reconsideration or appellate certification.  The court granted Whitewater's motion on May 2, 2013,[4] and granted McDonald's motion on May 28, 2013.[5]

On May 28, 2013, Whitewater filed a petition for permission to file an interlocutory appeal per Pa.R.A.P. 1311.  McDonald, on June 21, 2013, filed a petition to file an interlocutory appeal from the trial court's May 28, 2013 order.  This Court granted Whitewater's petition on July 11, 2013, and McDonald's petition on August 5, 2013.[6]

We address McDonald's appeal first, which raises one issue:

> Whether New York law should be applied to the facts of this case thereby rendering Whitewater's Release as void

---

[3] The docket and certified record do not reflect the actual motion, although Whitewater's certificate of service avers they filed it.  The certificate of service, which did not include a date of service, was time-stamped on April 18, 2013.

[4] The order was time-stamped on April 30, 2013, but the trial court did not serve notice until May 2, 2013.

[5] The order was time-stamped on May 23, 2013, and the trial court served notice on May 28, 2013.

[6] This Court consolidated both appeals *sua sponte* on March 12, 2014. Further, because the parties filed numerous briefs in both appeals, for ease of comprehension, we denote the parties' briefs by docket number.

and unenforceable under New York's statutory and decisional law, where this case poses a legitimate conflict-of-law question, and New York has a more significant relationship to this controversy and the outcome of this case?

McDonald's Brief, 1400 MDA 2013, at 6.

In support of her sole issue, McDonald argues the trial court erred by incorrectly applying the standard set forth in ***Griffith v. United Air Lines, Inc.***, 416 Pa. 1, 203 A.2d 796 (1964). She maintains that because she signed the release in New York, the contract was formed in New York. As a New York resident, McDonald asserts she is entitled to the benefit of New York law. McDonald claims that if Whitewater intended for Pennsylvania law to apply, then it should have included such a clause in its release. She points out that most of her medical treatment occurred in New York and that the New York State Insurance Fund has an interest in recouping her lost wages and medical expenses. We hold McDonald has not established entitlement to relief.

Initially, an order denying summary judgment is ordinarily a non-appealable interlocutory order. ***See Stewart v. Precision Airmotive, LLC***, 7 A.3d 266, 272 (Pa. Super. 2010). As noted above, however, the parties requested, and this Court granted, permission to file interlocutory appeals.[7] Order, 3/12/14.

---

[7] We acknowledge that generally, when the issue is a question of law, an appellant may be entitled to review of an order denying summary judgment.

The standard and scope of review is well-settled:

> Pennsylvania law provides that summary judgment may be granted only in those cases in which the record clearly shows that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. The moving party has the burden of proving that no genuine issues of material fact exist. In determining whether to grant summary judgment, the trial court must view the record in the light most favorable to the non-moving party and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Thus, summary judgment is proper only when the uncontroverted allegations in the pleadings, depositions, answers to interrogatories, admissions of record, and submitted affidavits demonstrate that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. In sum, only when the facts are so clear that reasonable minds cannot differ, may a trial court properly enter summary judgment. With regard to questions of law, an appellate court's scope of review is plenary. The Superior Court will reverse a grant of summary judgment only if the trial court has committed an error of law or abused its discretion.

*Charlie v. Erie Ins. Exchange*, 100 A.3d 244, 250 (Pa. Super. 2014)

(punctuation and citation omitted).

---

*Pridgen v. Parker Hannifin Corp.*, 588 Pa. 405, 421-22, 905 A.2d 422, 432-33 (2006) (holding collateral order doctrine applied to order denying summary judgment because party raised defense of statutory immunity). When the issue is a question of fact, appellate jurisdiction is lacking. *See Stewart*, 7 A.3d at 272. Thus, if an appellate court grants permission to appeal an order denying summary judgment, *see* 42 Pa.C.S. § 702, but later determines that the underlying issue is a question of fact, appellate jurisdiction is arguably lacking. *See generally id.*

As a prefatory matter, we must ascertain whether to apply a tort or contract choice of law framework.[8]  Two cases are instructive: **McCabe v. Prudential Prop. & Cas. Ins. Co.**, 356 Pa. Super. 223, 514 A.2d 582 (1986), and **Nationwide Mut. Ins. Co. v. Walter**, 290 Pa. Super. 129, 434 A.2d 164 (1981).  In **Walter**, this Court addressed an exclusionary provision in an insurance policy issued to a New Jersey resident for a car involved in a Pennsylvania accident.  **Walter**, 290 Pa. Super. at 133-34, 434 A.2d at 166. The car's driver and passenger were both Pennsylvania residents.  **Id.**  at 137, 434 A.2d at 168.  The exclusionary provision was invalid under New Jersey law and valid under Pennsylvania law.  **Id.** at 135-36, 434 A.2d at 167.  The **Walter** Court rejected the appellant's argument that Pennsylvania law should apply because the accident occurred in Pennsylvania and the injured occupants of the car were Pennsylvania residents:

> [The a]ppellant argues that Pennsylvania had the most significant contacts as the car was located in Pennsylvania when the accident occurred having been previously delivered to Bucks County Imports by [the insured], the accident occurred in Pennsylvania, and both occupants of the car at the time of the accident were Pennsylvania residents.  [The a]ppellant overlooks the fact that these points of contact with Pennsylvania pertained to the alleged tort involved.  We are concerned with the contract of insurance and as to the insurance policy New Jersey had the most significant contacts.

**Id.** at 137-38, 434 A.2d at 168.

---

[8] A statutory choice of law analysis does not apply to this case.

In **McCabe**, this Court similarly addressed which state's law applied in construing a Connecticut automobile insurance policy issued to a Connecticut resident. **McCabe**, 356 Pa. Super. at 225, 514 A.2d at 582. While in Pennsylvania, the Connecticut resident was involved in a car accident that injured a Pennsylvania resident. **Id.** The **McCabe** appellees argued that Pennsylvania law applied because, inter alia, the "victim is a resident of Pennsylvania, and the accident occurred there. Both [insurers] are licensed to do business in Pennsylvania." **Id.** at 232, 514 A.2d at 586. The **McCabe** Court rejected that argument based upon the **Walter** Court's reasoning. **Id.**

Both **Walter** and **McCabe** stand for the proposition that in a contract action involving an underlying tort and in which an insurance policy is at issue, the court will apply a contract law—and not a tort law—choice of law framework. **Id.**; **Walter**, 290 Pa. Super. at 137-38, 434 A.2d at 168; **see also Tayar v. Camelback Ski Corp.**, 616 Pa. 385, 394, 47 A.3d 1190, 1196 (2012) (applying contract law to interpret clause exculpating defendant ski resort from liability in negligence action); **Chepkevich v. Hidden Valley Resort, L.P.**, 607 Pa. 1, 26, 2 A.3d 1174, 1189 (2010) (same). Neither **Chepkevich** nor **Tayar** engaged in a choice of law analysis, but neither case looked beyond contract law in construing the clause. Thus, in the instant tort action involving a contractual exculpatory clause, but not involving an automobile insurance policy, we apply a contract choice of law framework. **See Tayar**, 616 Pa. at 394, 47 A.3d at 1196; **Chepkevich**, 607 Pa. at 26, 2

A.3d at 1189; **McCabe**, 356 Pa. Super. at 232, 514 A.2d at 586; **Walter**, 290 Pa. Super. at 137-38, 434 A.2d at 168; **cf. Lahey v. Covington**, 964 F. Supp. 1440, 1445 (D. Colo. 1996) (construing exculpatory agreement as barring plaintiff's negligence claims for injuries that occurred while whitewater rafting); **Bauer v. Aspen Highlands Skiing Corp.**, 788 F. Supp. 472, 474 (D. Colo. 1992) (invoking contractual standard of review in ascertaining whether exculpatory clause barred negligence claims).[9]

Having ascertained a contract choice of law framework applies, we set forth the following as background[10] with respect to choice of law principles applicable to cases not involving an explicit statutory[11] or a contractual

---

[9] In **Budtel Assocs., LP v. Cont'l Cas. Co.**, 915 A.2d 640 (Pa. Super. 2006), our Court held that the **Griffith** rule applies to contract cases. **Id.** at 643-44. **Budtel**, however, did not involve a negligence claim.

[10] **See** Gregory E. Smith, Choice of Law in the United States, 38 Hastings L.J. 1041, 1131 (1987) ("No state has a more convoluted, eclectic approach to choice of law than Pennsylvania. On various occasions, its courts have applied the First and Second Restatements, the center of gravity approach, interest analysis and Professor Cavers' 'principles of preference.'"); **accord Melville v. Am. Home Assurance Co.**, 443 F. Supp. 1064, 1076 (E.D. Pa. 1977) ("The opinions of the Pennsylvania courts both state and federal have left Pennsylvania's choice of law rules and methodology with respect to contract cases in utter disarray; indeed, the courts have used facially inconsistent legal standards without acknowledging apparently conflicting precedent."), *rev'd*, 584 F.2d 1306, 1313 (3d Cir. 1978) (predicting Pennsylvania would apply the **Griffith** choice of law framework to contract actions).

[11] **See, e.g.**, 42 Pa.C.S. § 5521(b) ("The period of limitation applicable to a claim accruing outside this Commonwealth shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, whichever first bars the claim.").

choice of law provision:[12] "the first step in a choice of law analysis under Pennsylvania law is to determine whether [an actual] conflict exists between the laws of the competing states. If no [actual] conflict exists, further analysis is unnecessary." **Budtel**, 915 A.2d at 643 (citation omitted). An actual conflict exists if "there are relevant differences between the laws." **Hammersmith v. TIG Ins. Co.**, 480 F.3d 220, 230 (3d Cir. 2007).[13]

If an actual conflict exists, then we classify it as "true," "false," or "unprovided-for." **Cipolla v. Shaposka**, 439 Pa. 563, 565, 267 A.2d 854, 855-56 (1970); **Miller v. Gay**, 323 Pa. Super. 466, 470, 470 A.2d 1353, 1355 (1983). A "true conflict" occurs "when the governmental interests of

---

[12] **Synthes USA Sales, LLC v. Harrison**, 83 A.3d 242, 252 (Pa. Super. 2013) ("Choice of law provisions in contracts will generally be given effect." (citation omitted)); **Nationwide Mut. Ins. Co. v. West**, 807 A.2d 916, 920 (Pa. Super. 2002) (same).

[13] With respect to federal decisions, we acknowledge the following:

> [F]ederal court decisions do not control the determinations of the Superior Court. Our law clearly states that, absent a United States Supreme Court pronouncement, the decisions of federal courts are not binding on Pennsylvania state courts, even when a federal question is involved. . . . Whenever possible, Pennsylvania state courts follow the Third Circuit so that litigants do not improperly "walk across the street" to achieve a different result in federal court than would be obtained in state court.

**NASDAQ OMX PHLX, Inc. v. PennMont Secs.**, 52 A.3d 296, 303 (Pa. Super. 2012) (citations omitted); **accord Parr v. Ford Motor Co.**, 109 A.3d 682, 693 n.8 (Pa. Super. 2014) (*en banc*) (citations and punctuation omitted).

**both** jurisdictions would be impaired if their law were not applied." **Garcia v. Plaza Oldsmobile, Ltd.**, 421 F.3d 216, 220 (3d Cir. 2005). "A 'false conflict' exists if only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law. In such a situation, the court must apply the law of the state whose interests would be harmed if its law were not applied."[14] **Lacey v. Cessna Aircraft Co.**, 932 F.2d 170, 187 (3d Cir. 1991) (footnote omitted); **Kuchinic v. McCrory**, 422 Pa. 620, 624, 222 A.2d 897, 899 (1966). In "unprovided-for" cases, "neither jurisdiction's interests would be impaired if its laws are not

---

[14] We are aware that Pennsylvania federal and state courts have defined "false conflict" inconsistently. Upon reflection, we agree with the rationale advanced by the United States Court of Appeals for the Third Circuit in **Hammersmith**:

> We think it is incorrect to use the term "false conflict" to describe the situation where the laws of two states do not differ. If two jurisdictions' laws are the same, then there is no **conflict** at all, and a choice of law analysis is unnecessary. Thus, the first part of the choice of law inquiry is best understood as determining if there is an **actual** or real conflict between the potentially applicable laws. **See, e.g.**, [**Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.**, 272 F. Supp. 2d 482, 490 n.9 (E.D. Pa. 2003)] ("Before we even reach the 'false conflict' question, we must determine whether, for lack of better terminology, a 'real conflict' as opposed to 'no conflict' exists; that is, we must determine whether these states would actually treat this issue any differently.").

**Hammersmith**, 480 F.3d at 230.

applied."[15]  **Garcia**, 421 F.3d at 220 (footnote omitted).  If a true conflict is found, then we must determine "which state has the greater interest in the application of its law."[16]  **Cipolla**, 439 Pa. at 566, 267 A.2d at 856.

In **Cipolla**, our Supreme Court examined whether a true conflict existed between the tort laws of Delaware and Pennsylvania.  **Id.** at 564, 267 A.2d at 855.  The defendant was a Delaware resident and the plaintiff was a Pennsylvania resident.  **Id.**  The defendant, who was driving a car registered in Delaware, was driving the plaintiff home to Pennsylvania when they collided with another vehicle in Delaware.  **Id.**  The plaintiff sued the

---

[15] We leave for another day a determination of which state's law applies in an "unprovided-for conflict" in contract cases.  In tort cases, generally, the law of the state where the injury occurred is applied.  **See Miller**, 323 Pa. Super. at 470-72, 470 A.2d at 1355-56.

[16] If there is more than one issue, then Pennsylvania applies dépeçage, *i.e.*, "different states' laws may apply to different issues in a single case . . . ." **Berg Chilling Sys., Inc. v. Hull Corp.**, 435 F.3d 455, 462 (3d Cir. 2006) (citation omitted); **Broome v. Antlers' Hunting Club**, 595 F.2d 921, 924 (3d Cir. 1979) (predicting Pennsylvania Supreme Court would apply law of different states to separate issues).  Although no court in this Commonwealth has explicitly held that Pennsylvania applies dépeçage, Pennsylvania federal courts have consistently applied the doctrine.  Furthermore, the doctrine is arguably suggested by, if not harmonious with, the **Griffith** Court's flexible choice of law framework.  **See Griffith**, 416 Pa. at 21, 203 A.2d at 805.  The United States Court of Appeals for the Third Circuit observed that dépeçage was implicit in Professor Cavers' choice of law analysis, which our Supreme Court approvingly quoted in **Cipolla**.  **See Reyno v. Piper Aircraft Co.**, 630 F.2d 149, 167 n.73 (3d Cir. 1980) (holding dépeçage is "implicit in the analysis of Professor Cavers" (citing David Cavers, The Choice-of-Law Process 40-43 (1965))), *rev'd on other grounds*, 454 U.S. 235 (1981); **Cipolla**, 439 Pa. at 567, 267 A.2d at 856-57 (quoting Cavers' treatise, *supra*, extensively).

defendant for negligence only, and our Supreme Court examined which state's law applied. *Id.* If Delaware law applied, then the plaintiff could not recover under a Delaware statute preventing a guest from recovering for the negligence of the host. *Id.* If Pennsylvania law applied, then the plaintiff could recover if he could establish the defendant's negligence. *Id.* at 564-65, 267 A.2d at 855. The *Cipolla* Court reasoned that a true conflict existed because the plaintiff "is a resident of Pennsylvania which has adopted a plaintiff-protecting rule and [the defendant] is a resident of Delaware which has adopted a defendant-protecting rule" and thus a "deeper analysis" was required to determine "which state has the greater interest in the application of its law." *Id.* at 565-66, 267 A.2d at 856.

Similarly, in *Rosen v. Tesoro Petroleum Corp.*, 399 Pa. Super. 226, 582 A.2d 27 (1990), the Superior Court ascertained whether a true conflict existed between the laws of Pennsylvania and Texas regarding a malicious prosecution claim. *Id.* at 231, 582 A.2d at 30. In Pennsylvania, seizure of the plaintiff's person or property is not a necessary element for malicious prosecution. *Id.* Texas, however, requires that a party alleging malicious prosecution suffer physical detention of the claimant's person or property. *Id.* The *Rosen* Court held there was a true conflict because Texas wished "to assure every potential litigant free and open access to the judicial system without fear of a countersuit for malicious prosecution." *Id.* at 232, 582 A.2d at 30. Pennsylvania, in contrast, provided "greater protection to those

individuals and entities who may be forced to defend a baseless suit." *Id.* at 233, 582 A.2d at 31. Thus, having concluded a true conflict existed, the *Rosen* Court then determined which state had "the greater interest in the application of its law on malicious prosecution to the instant matter." *Id.* at 233, 582 A.2d at 31.

In sum, in Pennsylvania, a conflict-of-law analysis not involving a statutory or contractual choice of law clause, first requires determining whether the laws in question actually conflict. *E.g.*, *Budtel*, 915 A.2d at 643. If relevant differences between the laws exist, then we next classify the actual conflict as a "true conflict," "false conflict," or "unprovided-for conflict." *Cipolla*, 439 Pa. at 565, 267 A.2d at 855-56; *Miller*, 323 Pa. Super. at 470, 470 A.2d at 1355.

Instantly, a New York statute voids clauses immunizing recreational facilities from liability for negligence because they violate New York's public policy.[17] N.Y. Gen. Oblig. Law § 5-326 (McKinney 2014). Pennsylvania, however, recognizes the validity of such exculpatory clauses when they govern voluntary and hazardous recreational activities. *See, e.g.*, *Chepkevich*, 607 Pa. at 36, 2 A.3d at 1195. Because relevant differences

---

[17] No party has suggested the statute applies outside of New York. *Cf. Garcia*, 421 F.3d at 220 (noting, "In our conflicts-of-law analysis[,] the first issue that we must address is whether New York's . . . [l]aw with respect to the issue at hand has extraterritorial application, and, accordingly, whether that law by its terms can be applied to determine liability for the Pennsylvania accident underlying this appeal.")

exist between New York and Pennsylvania jurisprudence, **see Hammersmith**, 480 F.3d at 230, there is an actual conflict that we must classify as a "true conflict," "false conflict," or "unprovided-for conflict."

Akin to **Rosen**, which identified a true conflict because of Pennsylvania's and Texas's diametrically opposing views on malicious prosecution, Pennsylvania provides greater protection to recreational facilities, unlike New York, which favors protecting participants injured at such facilities. **See Rosen**, 399 Pa. Super. at 232-33, 582 A.2d at 30-32. To paraphrase our Supreme Court in **Cipolla**, the fact that McDonald is a resident of New York, which has adopted a plaintiff-protecting rule, and Whitewater is a resident of Pennsylvania, which has adopted a defendant-protecting rule, demonstrates a true conflict. **See Cipolla**, 439 Pa. at 565-66, 267 A.2d at 856.

We thus ascertain whether New York "or Pennsylvania has the greater interest in the application of its law to the question now before us." **See id.** at 565, 267 A.2d at 855.

> In determining which state has the greater interest in the application of its law, one method is to see what contacts each state has with the accident, the contacts being relevant only if they relate to the "policies and interest underlying the particular issue before the court." [**Griffith**, 416 Pa. at 21, 203 A.2d at 805]. When doing this it must be remembered that a mere counting of contacts is not what is involved. The weight of a particular state's contacts must be measured on a qualitative rather than quantitative scale.

\*   \*   \*

Also, it seems only fair to permit a defendant to rely on his home state law when he is acting within that state.

> Consider the response that would be accorded a proposal that was the opposite of this principle if it were advanced against a person living in the state of injury on behalf of a person coming there from a state having a higher standard of care or of financial protection. The proposal thus advanced would require the community the visitor entered to step up its standard of behavior for his greater safety or lift its financial protection to the level to which he was accustomed. Such a proposal would be rejected as unfair. By entering the state or nation, the visitor has exposed himself to the risk of the territory and should not subject persons living there to a financial hazard that their law had not created.

> Inhabitants of a state should not be put in jeopardy of liability exceeding that created by their state's laws just because a visitor from a state offering higher protection decides to visit there.

*Id.* at 566-67, 267 A.2d at 856-57 (citations, punctuation, and footnote omitted); *accord Myers v. Commercial Union Assurance Cos.*, 506 Pa. 492, 496, 485 A.2d 1113, 1115-16 (1984).[18]

---

[18] We acknowledge that other Pennsylvania state and federal courts have construed the *Griffith* interest analysis differently. In *Gillan v. Gillan*, 236 Pa. Super. 147, 345 A.2d 742 (1975), and *Knauer v. Knauer*, 323 Pa. Super. 206, 470 A.2d 553 (1983), the Superior Court interpreted *Griffith* as adopting the Restatement (Second) of Conflicts of Law § 188, and applied the Restatement to the contracts at issue. *Knauer*, 323 Pa. Super. at 215, 470 A.2d at 558; *Gillan*, 236 Pa. Super. at 150, 345 A.2d at 744. Our Commonwealth Court in *Ario v. Underwriting Members of Lloyd's of London Syndicates 33, 205 & 506*, 996 A.2d 588 (Pa. Commw. 2010), similarly opined in an insurance contract case that *Griffith* "adopted the

For example, the **Walter** Court ascertained whether Pennsylvania or New Jersey law should apply to an automobile insurance policy. **Walter**, 290 Pa. Super. at 136, 434 A.2d at 167. The **Walter** Court reviewed each state's contacts with the contract:

> In this contract case, the state having the most vital contacts with the policy of insurance involved was New Jersey. The policy was issued in New Jersey by the appellant in June, 1972, to Mr. Walter, a resident of New Jersey. It was issued for the twofold purpose of giving insurance protection to Mr. Walter and others as set forth in the policy, and to comply with the requirements set forth in the New Jersey Motor Vehicle Security

---

approach of the Restatement of Conflict of Laws, Second to resolving choice of law questions." **Id.** at 595 (citations omitted). "We of course recognize that a decision of the Commonwealth Court is not binding precedent upon this Court; however, it may be considered for its persuasive value." **Holland v. Marcy**, 817 A.2d 1082, 1083 n.1 (Pa. Super. 2002) (*en banc*) (citation and punctuation omitted). Section 188 identifies several factors in resolving choice of law:

> (a) the place of contracting,
>
> (b) the place of negotiation of the contract,
>
> (c) the place of performance,
>
> (d) the location of the subject matter of the contract, and
>
> (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

Restatement (Second) of Contracts § 188 (1971). In contrast, the Third Circuit has consistently opined that **Griffith combined** "the 'approaches of both the Restatement II (contacts establishing significant relationships) and interests analysis (qualitative appraisal of the relevant States' policies with respect to the controversy).'" **Hammersmith**, 480 F.3d at 231 (punctuation omitted) (quoting **Melville**, 584 F.2d at 1311).

> Responsibility Statute . . . .  No matter where [Mr. Walter's agent] drove [Mr. Walter's] car or gave consent to others to operate his vehicle, [Mr. Walter] had the right to expect that his policy conformed to New Jersey law and that the laws of New Jersey would apply in interpreting the policy. Pennsylvania had no contact with the transaction involving the insurance policy.  It was by mere happenstance that the automobile was involved in an accident while located in Pennsylvania.  As noted in **Griffith v. United Airlines, Inc.**, 416 Pa. 24, 203 A.2d 806: "(T)he site of the accident purely fortuitous."

*Id.* at 137, 434 A.2d at 167-68.  Because, *inter alia*, the appellant "issued an insurance policy to [Mr. Walter] to cover an automobile located in New Jersey," and he obtained the policy to comply with New Jersey laws, the **Walter** Court held New Jersey law applied.  *Id.* at 138, 434 A.2d at 168.

In **McCabe**, this Court likewise examined each state's contacts to a Connecticut insurance contract:

> In the instant case, [the insurer] argues that Connecticut law would apply since [the insured] lived in Connecticut, and the . . . policy of Insurance was executed there.  It also contends that "underlying these contacts are Connecticut's sovereign interests that the rights of its residents and those who do business in its state are governed by Connecticut law and that its insurance law, as applied to the insurance policy, will be given full faith and credit by a sister state."  Finally, [the insurer] alleges that Connecticut has an interest in minimizing insurance premiums for its residents. . . .
>
> Pennsylvania had no contact with the transaction involving the insurance policy.  It was by mere happenstance that the Connecticut automobile owned and operated by [the insured] was involved in an accident while located in Pennsylvania. . . .  At this time, we are concerned with contract of insurance, and, as to the insurance policy, Connecticut had the most significant contacts.

*McCabe*, 356 Pa. Super. at 232, 514 A.2d at 586.

Instantly, similar to *McCabe* and *Walter*, whose contracts were executed outside of Pennsylvania, the exculpatory clause was executed in New York by McDonald, a New York resident. *See id.*; *Walter*, 290 Pa. Super. at 137, 434 A.2d at 167-68. New York certainly has a sovereign interest in protecting McDonald and may wish, as she averred, to recoup the costs of her medical treatment. *See McCabe*, 356 Pa. Super. at 232, 514 A.2d at 586. But, comparable to the insurance policy in *Walter*, the instant release was executed for the purpose of protecting Whitewater, a Pennsylvania business that "had the right to expect that [the release] conformed to [Pennsylvania] law and that the laws of [Pennsylvania] would apply in interpreting the [release]." *See Walter*, 290 Pa. Super. at 137, 434 A.2d at 167-68. "[I]t seems only fair to permit" Whitewater to rely on Pennsylvania law when it acted within Pennsylvania. *See Cipolla*, 439 Pa. at 567, 267 A.2d at 856. Whitewater should not be placed in jeopardy of liability exceeding that created by Pennsylvania law just because McDonald is a visitor from New York, a state offering higher protection. *See id.* Unlike *McCabe* and *Walter*, the site of the accident was not fortuitous, as the underlying accident occurred at Whitewater's place of business in Pennsylvania on a preplanned outing for which McDonald signed a contract. *Cf. McCabe*, 356 Pa. Super. at 232, 514 A.2d at 586; *Walter*, 290 Pa. Super. at 137, 434 A.2d at 167-68. After carefully weighing the sovereign

interests at stake, which include contacts establishing the significant relationships with each sovereign, we hold that Pennsylvania has the greater interest in the application of its law to this case. *See Cipolla*, 439 Pa. at 566, 267 A.2d at 856. Accordingly, we discern no basis for reversing the trial court's order on this point. *See Charlie*, 100 A.3d at 250.

We next address Whitewater's appeal, which raised the following issues:

> Whether the trial court erred by denying summary judgment on the basis of [McDonald's] alleged, and mere belief, that she was "economically compelled" to sign the release by her employer?
>
> Whether [Whitewater] was entitled to summary judgment because the "Release of Liability" is a valid and enforceable exculpatory clause involving a recreational activity as a matter of well-established Pennsylvania law?
>
> Whether [McDonald's] claims against Whitewater are barred by the valid and enforceable Release, which [McDonald] signed knowingly and fully conscious of its meaning, and which contains clear and unambiguous language expressly releasing [Whitewater] from any liability for negligent conduct and shows [McDonald's] express waiver of her right to bring any such negligence claims?

Whitewater's Brief, 1221 MDA 2013, at 5 (reordered to facilitate resolution).

We set forth the following as background.

> [McDonald] had testified in her deposition that on May 17, 2006, the Headmaster of the School of the Holy Child handed the Release form to [McDonald], while she was between classes and walking through the school hallway and told her to sign it, since she would be one of the chaperones for the students on the rafting trip.

[McDonald] alleges she signed the Release form without reading it.

Trial Ct. Op., 9/15/10, at 2. McDonald explained "that she did not read the Release because she had previously been on a whitewater trip in 2004." McDonald's Mem. of Law in Opp'n to Whitewater's Second Mot. for Summ. J., 1/14/13, at 6 (citation omitted).

At her deposition, McDonald testified about the circumstances of her departure from the School of the Holy Child:

> [Whitewater's counsel]. Why did you leave School of the Holy Child to go [elsewhere]?
>
> A. Well, due to the accident, I was only able to work part-time and after—
>
>        *    *    *
>
> A. And when [teaching] contracts were renewed [in February 2007], I was given a contract, but I only received a one percent increase and—
>
>        *    *    *
>
> A. . . . despite the fact that I had, you know, superior evaluation and the fact that I had been hurt on the job, I was insulted by the one percent increase.
>
> Q. Were you told by one of your supervisors that the reason you got a one percent increase was because of your reduced work and the fact that you were injured on the job?
>
> A. No.
>
> Q. Did anyone tell you that?
>
> A. No.

Q. That's something that you surmised—

A. Yes.

Q. —based on the circumstances?

A. Yes, sir.

Q. Well, it carried [sic] $5,000. I can't do the math very quickly, but.

A. Okay, all right, and this one percent raise turned out to be what?

A. Approximately $610.

Q. Okay, and your raises, while you were at School of the Holy Child, were they always consistent with approximately the $5,000 increase?

A. Three years previous to that, I'd gotten a $20,000 boost because I was seen as being a master teacher.

Q. Okay, all right. And this $600 . . . you didn't expect another $20,000 bump, but you thought you might get something closer to the 5 grand that you had gotten the previous year.

A. Yes.

Q. And when you didn't, you surmised it was because of your injury.

A. Yes, and I wasn't going to be able to do all the extras that are pretty much inherent in working in an independent school.

Q. Extras, such as what?

A. Chaperoning trips to Europe, did that. Attending trustees, board of trustees and faculty dinners. Participating in faulty/student games. All the extras that are just read into our contract.

Q. Okay, and those are things that you did prior to the accident.

A. Yeah.

Q. And you did not do them after the accident.

A. No.

Q. Okay, so when you got your one percent raise, is that when you quit, you resigned?

A. No, I looked for a job first.

Ex. C to McDonald's Mem. of Law in Opp'n to Whitewater's Second Mot. for Summ. J., at 11-14.

We reproduce the following exchange from the deposition testimony of Ann Sullivan, the head of the School of the Holy Child, regarding its annual job evaluations:

> [McDonald's counsel]. And in terms of conducting evaluations of employees, and in particular teachers, was participation in afterschool extracurriculars or school trips, was that a factor looked at in terms of doing the evaluation?
>
> A. I think it's discussed during the evaluation. If you look at the evaluation forms, which are very idiosyncratic, there are four buckets. One is professional competence, one is commitment—
>
> Q. I'm going to ask you—
>
> A. Let me give you the background—one is commitment to the community, the third is leadership, and the fourth is congruence with the mission. There was a lot of discussion as to what percent each of those buckets was taken into consideration, and, frankly, it varies, and there was no answer to that. And I have to say it was all of those ways, but to varying degrees. Some people are great community

people and not so great in the classroom, some people are great in the classroom and not so great in the community life. So, you know, it wasn't meant to be punitive. It was to recognize different contributions.

Q. All right, I understand. But I just want to make sure I understand correctly. Even though there were different ways—you indicated there were different wings [sic] attached to different factors, you are saying, if I understand correctly—I'm not trying to put words in your mouth—that participation in school trips and extracurricular activities was at least a factor?

A. I'm going to go back to that that it is a broader discussion of community than going on school trips. Sometimes it is class trips, sometimes it is attending events. You know, it's broader than that. It's not a quid pro quo. You don't get an extra $500 added to your salary because you are a chaperon [sic].

Q. Right, I understand there wasn't a specific dollar amount that was attached for any particular factor indicated on the evaluation form, but it was at least a factor that was put into the overall mix in conducting evaluations of faculty, is that fair to say?

A. But it could be something quite different. It could be being the moderator of the yearbook or the Model UN. You are a making this assumption that going on extracurricular trips was part of your evaluation. It's only one of many, many possible factors. I want you to know many people did not go on trips. There are a lot of young parents in the school and they are not able to go away overnight because—

[Sullivan's counsel]: Parents or teachers?

A. Parents who are teachers. There are teachers who are young parents, have infants and toddlers and couldn't do those trips, and certainly it was great if they would go to a concert and they would show up at field hockey games.

[McDonald's counsel]. I understand. No one was compelled to go on any particular trip, but participation in

things was at least a factor identified in her evaluation, is that correct?

A. I read [in McDonald's employment file] that her supervisor thanked her for going on trips and going to athletic events.

Q. Hum-hum.

A. But, you know, I could say that there were wonderful people who declined to go on the trips and there were no financial repercussions.

Q. Okay. No one was ever terminated for not going on any extracurricular trips?

A. Never. And they were not—their salaries were not reduced for not going on trips.

Q. And there was never an employee who was penalized in his or her paycheck for not going on a school extracurricular or participating in afterschool projects.

A. Right.

Ex. I to McDonald's Mem. of Law in Opp'n to Whitewater's Second Mot. for Summ. J., at 38-41.

In support of their first issue, Whitewater contends that economic compulsion does not apply because McDonald's employer—and not Whitewater—compelled McDonald to sign the release. Regardless, Whitewater argues that McDonald failed to present evidence establishing her employer compelled her to sign. Whitewater asserts that the undisputed

record demonstrated McDonald would have suffered no repercussions by not participating in rafting.[19]  We hold Whitewater is entitled to relief.

It is well-settled that the standard of review for an order resolving summary judgment is abuse of discretion or error of law.  **Charlie**, 100 A.3d at 250.  Our Supreme Court defined duress as follows:

> The formation of a valid contract requires the mutual assent of the contracting parties.  Mutual assent to a contract does not exist, however, when one of the contracting parties elicits the assent of the other contracting party by means of duress.  Duress has been defined as:
>
> > That degree of restraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness . . . .  The quality of firmness is assumed to exist in every person competent to contract, unless it appears that by reason of old age or other sufficient cause he is weak or infirm . . . .  Where persons deal with each other on equal terms and at arm's length, there

---

[19] Whitewater also contends McDonald waived her defense of duress by failing to raise it in her answer to Whitewater's new matter invoking the release as a defense.  Whitewater's Brief, 1221 MDA 2013, at 28 (citing only **Tri-State Roofing Co. of Uniontown v. Simon**, 187 Pa. Super. 17, 19, 142 A.2d 333, 334 (1958) [hereinafter "**Tri-State**"]).  The **Tri-State** Court did not hold that when the defendant invokes a contract as a defense in a new matter, the plaintiff is bound to raise all affirmative defenses in its reply to the new matter.  Rather, the Court was merely summarizing the procedural posture in which the defendant filed a reply alleging duress in response to the plaintiff's new matter.  **See id.** at 19, 142 A.2d at 335.  Whitewater did not articulate any other basis for waiver, and it is well-settled that we may not reverse on an argument not raised.  **See generally** Pa.R.A.P. 302.  Accordingly, we decline to hold McDonald waived her defense.

> is a presumption that the person alleging duress possesses ordinary firmness . . . . Moreover, **in the absence of threats of actual bodily harm there can be no duress where the contracting party is free to consult with counsel** . . . .

**Degenhardt v. Dillon Co.**, 543 Pa. 146, 153-54, 669 A.2d 946, 950 (1996) (citations and punctuation omitted).

Economic duress, *i.e.*, business or economic compulsion, is a form of duress. **Tri-State**, 187 Pa. Super. at 20, 142 A.2d at 335. The **Tri-State** Court defined economic duress as follows:

> To constitute duress or business compulsion there must be more than a mere threat which might possibly result in injury at some future time, such as a threat of injury to credit in the indefinite future. It must be such a threat that, in conjunction with other circumstances and business necessity, the party so coerced fears a loss of business unless he does so enter into the contract as demanded.

**Id.** at 20-21, 142 A.2d at 335 (citation and punctuation omitted). The Court applied the above principles in ascertaining "whether [the] plaintiff's threat to breach its contract with the defendant, if defendant did not sign the release . . . , constituted duress." **Id.** at 18, 142 A.2d at 334.

In **Litten v. Jonathan Logan, Inc.**, 220 Pa. Super. 274, 286 A.2d 913 (1971), this Court addressed whether a prior, favorable oral contract or a subsequent, unfavorable written contract controlled. **Id.** at 276-77, 286 A.2d at 914. "Plaintiffs contend they were compelled under the duress and coercion of the defendant to enter into the written contract because defendant had maneuvered plaintiffs into an untenable economic crisis from

which they could extricate themselves only by signing the agreement prepared by defendant." **Id.** at 277, 286 A.2d at 914-15.  The jury agreed with the plaintiffs, and the defendant appealed, arguing, *inter alia*, the court failed to instruct the jury properly regarding duress.  **Id.** at 277, 286 A.2d at 915.  This Court affirmed, holding the defendant economically compelled the plaintiff to execute the subsequent written contract.  **Id.** at 281-82, 286 A.2d at 917.  In affirming the jury verdict, this Court approvingly quoted the trial court's jury charge, which identified the elements of economic duress:

> (1) there exists such pressure of circumstances which compels the injured party to involuntarily or against his will execute an agreement which results in economic loss, and (2) the injured party does not have an immediate legal remedy.  The cases cited by defendant on this point . . . are inapplicable because in those cases the defendants did not bring about the state of financial distress in which plaintiffs found themselves at the time of signing.  In the instant case, the final and potentially fatal blow was prepared by defendant, which by its actions created the situation which left plaintiffs with no alternative but to sign the contract as written.
>
> *    *    *
>
> Business compulsion is not establish[ed] merely by proof that consent was secured by the pressure of financial circumstances, but a threat of serious financial loss may be sufficient to constitute duress and to be ground for relief where an ordinary suit at law or equity might not be an adequate remedy. . . .

**Id.** at 282-83, 286 A.2d at 917 (citations, punctuation, and footnote omitted).

In **Chepkevich**, our Supreme Court adverted to economic duress in resolving whether an exculpatory agreement should be construed as a contract of adhesion:

[D]ownhill skiing—like auto racing—is a voluntary and hazardous activity . . . . Moreover, an exculpatory agreement conditioning use of a commercial facility for such activities has not been construed as a typical contract of adhesion. The signer is under no compulsion, economic or otherwise, to participate, much less to sign the exculpatory agreement, because it does not relate to essential services, but merely governs a voluntary recreational activity. **See** [**Schillachi v. Flying Dutchman Motorcycle Club**, 751 F. Supp. 1169 (E.D. Pa. 1990)] (exculpatory clause valid under Pennsylvania law where activity is purely recreational); **Grbac v. Reading Fair Co.**, 521 F. Supp. 1351, 1355 (W.D. Pa. 1981), *aff'd*, 688 F.2d 215 (3d Cir. 1982) (exculpatory clause releasing stock car racing company from liability for death arising out of recreational race not invalid contract of adhesion under Pennsylvania law). The signer is a free agent who can simply walk away without signing the release and participating in the activity, and thus the contract signed under such circumstances is not unconscionable. . . .

It is also apparent that the Release here is valid under the other elements of the [standard governing validity of exculpatory provisions set forth in **Topp Copy Prods., Inc. v. Singletary**, 533 Pa. 468, 626 A.2d 98 (1993), and **Emp'rs Liab. Assurance Corp. v. Greenville Bus. Men's Ass'n**, 423 Pa. 288, 224 A.2d 620 (1966) (referred to as the **Topp Copy**/**Employers Liability** standard)], aside from adhesion contract concerns. First, the Release cannot be said to contravene any policy of the law. Indeed, the clear policy of this Commonwealth, as embodied by the [Skier's Responsibility] Act, is to encourage the sport and to place the risks of skiing squarely on the skier. 42 Pa.C.S. § 7102(c)(2). Furthermore, Pennsylvania courts have upheld similar releases respecting skiing and other inherently dangerous sporting activities. **See, e.g.**, **Wang v. Whitetail Mountain Resort**, 933 A.2d 110 (Pa. Super. 2007) (citing

> Superior Court panel's decision in instant case, but upholding release as applied to snow tubing accident); [**Nissley v. Candytown Motorcycle Club**, 913 A.2d 887 (Pa. Super. 2006)] (upholding exculpatory agreement that released defendant motorcycle club from "all liability"); [**Zimmer v. Mitchell & Ness**, 253 Pa. Super. 474, 385 A.2d 437 (1978)] (upholding exculpatory clause releasing ski rental shop from liability for injury suffered when skier's bindings failed to release during fall). And, finally, the Release [the appellee] signed is a contract between the ski resort and [the appellee] relating to their private affairs, specifically [the appellee's] voluntary use of the resort's facilities.

**Chepkevich**, 607 Pa. at 28-30, 2 A.3d at 1190-91. Thus, an exculpatory clause is not typically analyzed within the framework of whether it is an contract of adhesion. **Id.** at 29, 2 A.3d at 1191 ("The signer is under no compulsion, economic or otherwise, to participate, much less to sign the exculpatory agreement, because it does not relate to essential services, but merely governs a voluntary recreational activity.").

The case of **Gillingham v. Consol Energy, Inc.**, 51 A.3d 841 (Pa. Super. 2012), *appeal denied*, 621 Pa. 679, 75 A.3d 1282 (2013), is also instructive. Technical Solutions contractually employed Gillingham to work full-time on a software development project located at one of Consol Energy's properties; Gillingham was considered an independent contractor of Consol. **Id.** at 853-54. A few weeks later, Consol asked Gillingham to sign "a stack of documents," which included

> a waiver of his right to sue Consol in the event he was injured due to its negligence. He felt that he had to sign the pages in question since he was contractually obligated to provide his services on the project through Technical

> Solutions. Mr. Gillingham believed that he was not in a position to refuse to sign the documents presented to him by Consol, and he stated, "If I would have not signed them, I would have to leave the site . . . because it's like saying, No, I'm not going to honor your agreement and protect this technology." He also would have violated his contract with Technical Solutions.

*Id.* at 854 (citation omitted). While exiting a Consol building via an exterior metal stairway, Gillingham was injured when the stairway collapsed. *Id.* at 847.

Gillingham successfully sued Consol. *Id.* On appeal, Consol contended the trial court should have granted its request for judgment notwithstanding the verdict because of the release Gillingham signed. *Id.* at 852. Gillingham countered that he felt compelled to sign the Consol release because (1) "he was contractually obligated to provide his services on the project through Technical Solutions," and (2) he would have violated his employment contract with Technical Solutions, *i.e.*, his employer. *Id.* at 854. The *Gillingham* Court held the record was sufficient to have a jury ascertain whether "Gillingham, who was under contract to provide services on the project, was compelled to execute the documents due to Consol's superior bargaining position." *Id.* The Court thus affirmed the jury's verdict in favor of Gillingham. *Id.*

Instantly, we frame Whitewater's question as whether one party to a contract can invoke duress when that duress was allegedly imposed by a non-party and not by the other party to the contract. More precisely, we

examine whether McDonald can void the release by claiming the School of the Holy Child economically compelled her to sign the release with Whitewater. McDonald's presumption is that economic compulsion, *i.e.*, duress, by a non-party to a contract can be "transferred."

Under these unique facts, we decline McDonald's apparent invitation to expand a doctrine traditionally invoked between contracting parties. Our Supreme Court held that mutual assent is a prerequisite to contract formation and that such mutual assent is absent "when one of the contracting parties elicits the assent of the other contracting party by means of duress." *See Degenhardt*, 543 Pa. at 153, 669 A.2d at 950. McDonald and Whitewater are the contracting parties to the release; the School of the Holy Child is not a contracting party. It follows that the School of the Holy Child could not elicit the assent of McDonald by duress. *See id.*

Further, McDonald does not claim Whitewater economically compelled her to sign the release. Unlike the plaintiff in *Litten*, McDonald has not alleged that Whitewater—a contracting party—maneuvered her into economic distress and compelled her to sign the contract. *Cf. Litten*, 220 Pa. Super. at 281-82, 286 A.2d at 917; *Tri-State*, 187 Pa. Super. at 18, 142 A.2d at 334 (resolving allegation of duress between contracting parties). Whitewater, which provided recreational services similar to the ski resort in *Chepkevich*, did not compel McDonald to participate, "much less . . . sign the exculpatory agreement." *See Chepkevich*, 607 Pa. at 29, 2 A.3d at

1191.  In contrast to **Gillingham**, in which the plaintiff was contractually obligated to work for Consol, the other contracting party, McDonald was not contractually obligated to participate in recreational activities at Whitewater. **Cf. Gillingham**, 51 A.3d at 854.  Nor did she allege that she would have violated her contract with the School of the Holy Child if she did not sign the Whitewater release.  **Cf. id.** (stating plaintiff would have violated his employment contract with Technical Solutions, his direct employer, if he did not sign Consol release).  In sum, given the predicate condition of a threat by one contracting party against another contracting party, economic duress by a non-party to a contract does not appear easily amenable to concepts of "transference" in this case.[20]

Assuming, however, duress by a non-contracting party could be invoked to negate mutual assent between contracting parties, and assuming that the possibility of not receiving a raise greater than 1% is a cognizable economic loss, McDonald's suggestion that unless she signed the release, she could potentially not receive such a raise is, on this record, too conjectural.  **See Litten**, 220 Pa. Super. at 282, 286 A.2d at 917; **Tri-State**, 187 Pa. Super. at 20-21, 142 A.2d at 335 (holding duress is "more than a mere threat" of possible economic injury in indefinite future).  McDonald notes she received only a 1% raise in February of 2007.  **See** Ex.

---

[20] We do not foreclose the possibility, however, in other cases.

C to McDonald's Mem. of Law in Opp'n to Whitewater's Second Mot. for Summ. J., at 13. But a minimal raise, after the fact, does not alone demonstrate that when McDonald signed the release in May 2006, she did so because she feared economic injury, *i.e.*, not receiving a raise greater than 1%.

Having resolved that economic compulsion is not available to McDonald, we address Whitewater's last two issues together: whether the release is valid and enforceable and thus bars McDonald's claims. Whitewater asserts the release met all the elements of the **Topp Copy**/**Employers Liability** standard governing the validity of exculpatory clauses. Whitewater thus contends the trial court erred by denying summary judgment on liability. Whitewater, we hold, is entitled to relief.

In **Chepkevich**, our Supreme Court resolved "whether a skier may maintain a negligence action against a ski resort for injuries sustained while skiing or whether suit is barred by statute and/or a release signed by the skier." **Chepkevich**, 607 Pa. at 3, 2 A.3d at 1175.

> The Release, printed on a single page and titled "RELEASE FROM LIABILITY," stated:
>
>> Skiing, Snowboarding, and Snowblading, including the use of lifts, is a dangerous sport with inherent and other risks which include but are not limited to variations in snow and terrain, ice and icy conditions, moguls, rocks, debris (above and below the surface), bare spots, lift towers, poles, snowmaking equipment (including pipes, hydrants, and component parts), fences and the absence of fences and

other natural and manmade objects, visible or hidden, as well as collisions with equipment, obstacles or other skiers. . . . All the risks of skiing and boarding present the risk of serious or fatal injury. By accepting this Season Pass I agree to accept all these risks and agree not to sue Hidden Valley Resort or their employees if injured while using their facilities regardless of any negligence on their part.

*Id.* at 5, 2 A.3d at 1176.

The ***Chepkevich*** Court set forth the three elements of the ***Topp Copy***/***Employers Liability*** standard for determining the validity and enforceability of an exculpatory clause:

It is generally accepted that an exculpatory clause is valid where three conditions are met. First, the clause must not contravene public policy. Secondly, the contract must be between persons relating entirely to their own private affairs and thirdly, each party must be a free bargaining agent to the agreement so that the contract is not one of adhesion. In ***Dilks v. Flohr Chevrolet***, 411 Pa. 425, 192 A.2d 682 (1963), we noted that once an exculpatory clause is determined to be valid, it will, nevertheless, still be unenforceable unless the language of the parties is clear that a person is being relieved of liability for his own acts of negligence. In interpreting such clauses we listed as guiding standards that: 1) the contract language must be construed strictly, since exculpatory language is not favored by the law; 2) the contract must state the intention of the parties with the greatest particularity, beyond doubt by express stipulation, and no inference from words of general import can establish the intent of the parties; 3) the language of the contract must be construed, in cases of ambiguity, against the party seeking immunity from liability; and 4) the burden of establishing the immunity is upon the party invoking protection under the clause.

***Chepkevich***, 607 Pa. at 26, 2 A.3d at 1189 (citations omitted). Our Supreme Court held the release was valid and enforceable, and concluded the release barred the skier's negligence lawsuit.[21] ***Id.*** at 3, 31, 35, 2 A.3d at 1175, 1192, 1195.

In ***Tayar***, the plaintiff was injured while snow tubing at a ski resort. ***Tayar***, 616 Pa. at 390, 47 A.3d at 1193. She raised claims of negligence and reckless conduct against the ski resort and one of its employees. ***Id.*** at 391, 47 A.3d at 1194 (summarizing trial court's decision). In response, the defendants asserted the plaintiff's claims were barred because she signed the following release:

CAMELBACK SNOW TUBING

ACKNOWLEDGMENT OF RISKS AND AGREEMENT NOT TO SUE

THIS IS A CONTRACT–READ IT

I understand and acknowledge that snow tubing, including the use of lifts, is a dangerous, risk sport and that there are inherent and other risks associated with the sport and that all of these risks can cause serious and even fatal injuries. I understand that part of the thrill, excitement and risk of snow tubing is that the snow tubes all end up in a common, runout area and counter slope at various times and speeds and that it is my responsibility to try to avoid hitting another snowtuber and it is my responsibility to try to avoid being hit by another snowtuber, but that,

---

[21] The ***Chepkevich*** Court also held that the skier's lawsuit was alternatively barred by the Skier's Responsibility Act, 42 Pa.C.S. § 7102. ***See Chepkevich***, 607 Pa. at 25, 2 A.3d at 1188.

> notwithstanding these efforts by myself and other snowtubers, there is a risk of collisions.
>
> *   *   *
>
> IN CONSIDERATION OF THE ABOVE AND OF BEING ALLOWED TO PARTICIPATE IN THE SPORT OF SNOWTUBING, I AGREE THAT I WILL NOT SUE AND WILL RELEASE FROM ANY AND ALL LIABILITY CAMELBACK SKI CORPORATION IF I OR ANY MEMBER OF MY FAMILY IS INJURED WHILE USING ANY OF THE SNOWTUBING FACILITIES OR WHILE BEING PRESENT AT THE FACILITIES, EVEN IF I CONTEND THAT SUCH INJURIES ARE THE RESULT OF NEGLIGENCE OR ANY OTHER IMPROPER CONDUCT ON THE PART OF THE SNOWTUBING FACILITY.

*Id.* at 388-89, 47 A.3d at 1192-93. The trial court agreed with the defendants that the release absolved them of liability. *Id.* at 390-91, 47 A.3d at 1194. The plaintiff appealed to the Superior Court on, *inter alia*, whether the release exculpated defendants from reckless conduct. *Id.* at 391, 47 A.3d at 1194. The Superior Court, in an *en banc* decision, held that the release was limited to negligent conduct only. *Id.* (summarizing Superior Court's holding).

The **Tayar** Court granted allowance of appeal to address, among other issues, whether the release barred the plaintiff's claim for reckless conduct. *Id.* at 392, 47 A.3d at 1194. Our Supreme Court initially observed that "exculpatory clauses releasing a party from negligence generally are not against public policy." *Id.* at 401, 47 A.3d at 1200. The **Tayar** Court held that the above release did not exculpate the defendants from reckless conduct because of the fundamental differences between negligence and

recklessness. **Id.** at 403, 47 A.3d at 1201. Thus, our Supreme Court held that the plaintiff's claim for reckless conduct could proceed. **Id.** at 406, 47 A.3d at 1203.

Regarding the first element needed for a valid exculpatory clause, Pennsylvania courts have affirmed exculpatory releases for "skiing and other inherently dangerous sporting activities," such as snowtubing and motorcycle racing. **See Chepkevich**, 607 Pa. at 30, 2 A.3d at 1191 (citing **Wang**, **supra**, and **Nissley**, **supra**). Other activities include automobile racing,[22] paintballing,[23] and whitewater rafting.[24] Thus, Pennsylvania courts have held exculpatory clauses pertaining to inherently dangerous sporting activities do not "contravene any policy of the law."[25] **Chepkevich**, 607 Pa. at 29, 2 A.3d at 1191.

---

[22] **Seaton v. E. Windsor Speedway, Inc.**, 400 Pa. Super. 134, 140, 582 A.2d 1380, 1383 (1990) (affirming summary judgment in favor of defendant based on valid and enforceable exculpatory agreement signed by plaintiff).

[23] **Martinez v. Skirmish, U.S.A., Inc.**, Civ. No. 07-5003, 2009 WL 1676144, *12, 2009 U.S. Dist. LEXIS 51628, *34 (E.D. Pa. June 15, 2009) (holding release was valid and enforceable against plaintiff's negligence claim).

[24] **Wroblewski v. Ohiopyle Trading Post**, Civ. No. 12-0780, 2013 WL 4504448, at *9, 2013 U.S. Dist. LEXIS 119206, at *30 (W.D. Pa. Aug. 22, 2013) (concluding release signed by plaintiff exculpated whitewater rafting company for plaintiff's negligence claim).

[25] Courts have held invalid exculpatory clauses involving bailees, banks, and common carriers. **Dilks**, 411 Pa. at 434 n.9, 192 A.2d at 687 n.9 (citing cases).

With respect to the second element, our Supreme Court held "[t]he *validity* of a contractual provision which exculpates a person from liability for his own acts of negligence is well settled if the contract is between persons relating entirely to their own private affairs." **Dilks**, 411 Pa. at 433, 192 A.2d at 687. Lastly, the third element's reference to "contracts of adhesion" may be problematic given different facts, as the **Chepkevich** Court acknowledged. **Chepkevich**, 607 Pa. at 28 n.18, 2 A.3d at 1190 n.18. The **Chepkevich** Court conceded that if the plaintiff "could not dicker over the terms of the form contract," the release could have been a contract of adhesion. **Id.** But our Supreme Court emphasized, "such contracts executed in the course of voluntary participation in recreational activities have not been declared unenforceable on these grounds, presumably because we recognize an inherent policy-based distinction between 'essential' activities (such as signing a residential lease) and voluntary, non-essential ones (such as engaging in dangerous sports)." **Id.** Finally, absent fraud, "failure to read [the contract] is an unavailing excuse or defense and cannot justify an avoidance, modification or nullification of the contract or any provision thereof." **Standard Venetian Blind Co. v. Am. Empire Ins. Co.**, 503 Pa. 300, 305, 469 A.2d 563, 566 (1983) (citations omitted and alteration in original).

Instantly, Whitewater's exculpatory clause addressing negligence does not contravene Pennsylvania's public policy. **See Tayar**, 616 Pa. at 401, 47

A.3d at 1200; *Chepkevich*, 607 Pa. at 29, 2 A.3d at 1191. Pennsylvania state and federal courts have affirmed substantively identical clauses in other dangerous sporting activities, including whitewater rafting. *See Chepkevich*, 607 Pa. at 30, 2 A.3d at 1191 (collecting cases); *see also Wroblewski*, 2013 WL 4504448, at *9, 2013 U.S. Dist. LEXIS 119206, at *30. Second, the release between McDonald and Whitewater related entirely to her participation in a hazardous recreational activity. *See Dilks*, 411 Pa. at 433, 192 A.2d at 687. We acknowledge that McDonald chaperoned this trip and that, in general, chaperoning field trips, among other duties, was an "extra" duty inherent to working at the School of the Holy Child. *See* Ex. C to McDonald's Mem. of Law in Opp'n to Whitewater's Second Mot. for Summ. J., at 14. But McDonald did not identify any materials issues of fact contradicting Sullivan's deposition testimony that no teacher was compelled to chaperone any particular trip. *See* Ex. I to McDonald's Mem. of Law in Opp'n to Whitewater's Second Mot. for Summ. J., at 40-41. Indeed, McDonald did not dispute that an employee was not required to participate in extracurricular trips to demonstrate commitment to the community—one of four areas employees are evaluated in each year. *See id.* Lastly, identical to the plaintiff in *Chepkevich*, McDonald voluntarily engaged in a non-essential activity. *See Chepkevich*, 607 Pa. at 28 n.18, 2 A.3d at 1190 n.18. Accordingly, we hold Whitewater's exculpatory clause is valid. *See id.* at 26, 2 A.3d at 1189.

As for the clause's enforceability, we examine whether the clause "spells out the intention of the parties with particularity and shows the intent to release [Whitewater] from liability by express stipulation." *See id.* at 30, 2 A.3d at 1191. The instant clause was titled "**RELEASE OF LIABILITY – *READ BEFORE SIGNING***" "in capital letters in large font at the top," identical to the ***Chepkevich*** release. *See id.* at 31, 2 A.3d at 1192. The language releasing Whitewater from liability was written in the same size font as the body of the release and required McDonald's signature. *See id.*

> Whether or not [McDonald] availed herself of the opportunity to read the Release she signed, we cannot agree that a full-page, detailed agreement, written in normal font and titled "RELEASE [OF] LIABILITY" constitutes an insufficient effort on the part of [Whitewater] to inform [McDonald] of the fact that, by signing [the release], she was giving up any right she might have to sue for damages arising from injuries caused even by negligence.

*See id.* Further, McDonald voluntarily engaged in whitewater rafting and Whitewater did not compel her to sign the release. *See id.* McDonald admittedly did not attempt to negotiate the terms of the release. *See id.* Accordingly, we conclude the release is enforceable. *See id.* Because the release is valid and enforceable, the trial court erred by denying Whitewater's motion for summary judgment on liability and thus, Whitewater is due relief. ***See Charlie***, 100 A.3d at 250. The order below is affirmed with respect to its holding that Pennsylvania law applies and

reversed to the extent it held material issues of fact existed regarding Whitewater's liability.

Order affirmed in part and reversed in part. Case remanded with instructions to grant judgment in favor of Whitewater and adverse to McDonald and for further proceedings, as deemed necessary. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/29/2015